# IN THE SUPREME COURT OF TEXAS

═══════════

No. 11-0228

═══════════

BYRON D. NEELY, INDIVIDUALLY, AND BYRON D. NEELY, M.D., P.A.,
PETITIONERS,

v.

NANCI WILSON, CBS STATIONS GROUP OF TEXAS, L.P., D/B/A KEYE-TV, AND
VIACOM, INC., RESPONDENTS

═══════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

═══════════════════════════════════

**Argued September 13, 2012**

JUSTICE GUZMAN delivered the opinion of the Court, in which JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE BOYD, and JUSTICE DEVINE joined.

CHIEF JUSTICE JEFFERSON filed a dissenting opinion, in which JUSTICE GREEN and JUSTICE LEHRMANN joined.

JUSTICE HECHT did not participate in the decision.

This is an appeal of a summary judgment granted to media defendants in a suit stemming from their investigative broadcast involving a physician. This suit, like all defamation suits, implicates the competing constitutional rights to seek redress for reputational torts and the constitutional rights to free speech and press. But we have long held that despite these concerns,

we adhere to our well-settled summary judgment standards.[1] Thus, we decide here whether the physician raised a genuine issue of material fact to defeat summary judgment and proceed to trial on his defamation claim.

Truth is a defense to all defamation suits. Additionally, the Legislature has provided other specific defenses for media defendants, such as the official/judicial proceedings privilege, the fair comment privilege, and the due care provision. Here, the media defendants raised various defenses in their summary judgment motion but focused primarily on the truth defense: there is no defamation liability if the gist of the broadcast is substantially true. In the court of appeals, the media defendants mainly argued that we created a rule in *McIlvain v. Jacobs*[2] that a media defendant's reporting of third-party allegations is substantially true if it accurately reports the allegations—even if the allegations themselves are false. We created no such rule in *McIlvain*, and the facts of this case likewise do not require us to create such a rule. While it is possible for the gist of a broadcast to be mere allegation reporting (such that the truth of such a broadcast might be measured by its accuracy), a person of ordinary intelligence could conclude that the gist of the broadcast at issue was that the physician was disciplined for operating on patients while taking dangerous drugs or controlled substances. We hold the physician raised a genuine issue of material fact as to the truth

---

[1] *Casso v. Brand*, 776 S.W.2d 551, 555 n.3 (Tex. 1989) (noting that constitutional implications in defamation claims do not alter our summary judgment standards).

[2] 794 S.W.2d 14 (Tex. 1990).

or falsity of that gist with evidence that he was not disciplined for taking dangerous drugs or controlled substances and had never performed surgery while taking them.[3]

As to the remaining defenses, the media defendants did not raise the due care provision in their summary judgment motion and have not conclusively proven the application of another defense or privilege. At trial, the media defendants may well prevail on the truth defense or on one or more of these other defenses and privileges, but they have not conclusively done so here. We therefore reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings.

## I. Factual Background

Dr. Byron Neely is a neurosurgeon who practiced in Austin. In 1999, he installed a shunt to drain fluid from a tumor in Paul Jetton's brain. An enterobacterial infection set in, leaving Paul in a debilitated state even after 12 subsequent brain surgeries. Paul and his wife, Sheila, sued Neely and others, and Neely settled. In 2002, the Jettons filed a complaint with the Texas Medical Board (Board), and the Board investigation found no wrongdoing by Neely.

---

[3] On rehearing, no party challenges our holding that we have not yet recognized a rule establishing accuracy as the test for the substantial truth of a broadcast that repeats third-party allegations. Briefing submitted in support of rehearing construes our opinion as foreclosing such a rule and as affirmatively requiring the underlying allegation be proven substantially true to prevail on the truth defense. That interpretation, however, misconstrues our holding. We conclude there is a fact issue as to the truth or falsity of the gist of the media defendants' broadcast indicating the physician was disciplined for operating on patients while taking dangerous drugs or controlled substances. Importantly, this fact issue as to truth is likewise a fact issue as to accuracy. Though the media defendants advocate for accuracy as the test for truthfulness of the gist, given our holding concerning the gist, such a rule would not shield the media defendants here. We thus, as we must, leave open the question of whether a broadcast whose gist is merely that allegations were made is substantially true if the allegations were accurately repeated. *See Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 147 (Tex. 2012) (discussing prohibition on rendering advisory opinions).

3

Neely also performed surgery on Wei Wu in 1999.  After removing a brain tumor, Neely reported seeing small deposits of metastatic melanoma on the surface of Wu's brain during surgery.[4] Soon after Wu recovered from the operation and learned of the melanoma deposits from his oncologist, he committed suicide.  The autopsy report indicated "no residual metastatic melanoma on gross inspection," which the coroner later clarified to mean that he believed Wu no longer had any melanoma after the operation.  Wu's ex-wife sued Neely on behalf of her minor son, but the suit was dismissed on procedural grounds.[5]

In 2003, after a separate investigation by the Board, Neely entered into an Agreed Order (Order).  In the Order, the Board found that Neely had self-prescribed medications between 1999 and 2002 and had a prior history of hand tremors.  Further, the Board found that he was subject to disciplinary action due to his "inability to practice medicine with reasonable skill and safety to patients, due to mental or physical condition" and his self-prescription of medications.  The Order suspended Neely's license, but stayed the suspension, placed him on probation for three years, ordered physical and psychiatric evaluations, and prohibited Neely from prescribing medications to himself or his family.

In January 2004, KEYE-TV in Austin ran a 7-minute investigative report by Nanci Wilson (collectively "KEYE") regarding Neely.  The transcript of the entire broadcast is attached as Appendix A.  The broadcast began with anchor Fred Cantu asking:

---

[4] "Metastatic cancer is cancer that has spread from the place where it first started to another place in the body." *Metastatic Cancer*, National Cancer Institute (Mar. 28, 2013), http://www.cancer.gov/cancertopics/factsheet/ Sites-Types/metastatic (on file with Clerk's office).

[5] The Board also investigated the Wu case and found no wrongdoing, but that order issued after the broadcast in question.

4

If you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs, had a history of hand tremors and had been sued several times for malpractice in the last few years?

Co-anchor Judy Maggio continued:

A central Texas couple says they didn't learn about this until it was too late. They're outraged the [Board] is allowing Dr. Byron Neely to continue to practice. KEYE news investigative reporter Nanci Wilson tells us if you go to St. David's Hospital with a head injury you could be Dr. Neely's next patient.

Wilson then interviewed Paul Jetton, who related that Neely recommended surgery after an MRI indicated he had a brain tumor. Wilson stated that the hospital discharged Jetton despite the fact that a bacterial infection set in at the surgical site. Wilson continued:

The result: numerous surgeries and a life of disability. Paul's wife, Sheila, says what they learned from other doctors was the final blow.

Sheila Jetton then stated:

Every neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have [sic] said they would have never done surgery. They would have watched him with MRIs over years.

Wilson segued to discuss the Wu case, relating that Neely discovered and removed malignant melanoma from Wu's brain during surgery and that Wu committed suicide after learning of the diagnosis. Wilson then stated that when

the Travis County Medical Examiner's office, analyz[ed] Wu's brain[], examiners noted no residual metastatic melanoma. Meaning Wei Wu did not have brain cancer.

Wilson continued:

The [Board] investigated Dr. Neely. The board found Neely had a history of hand tremors and that between 1999 and 2002, Dr. Neely was writing prescriptions, not only for his patients but for himself as well. Narcotics, muscle relaxers and pain killers. Something former patient Paul Jetton finds shocking.

5

Paul Jetton commented:

> Narcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people. I mean it's just, even now I'm just, it's just incredulous, you just can't even believe that it even happened.

Wilson then related that the Order placed Neely on probation, required him to see a psychiatrist, and prohibited him from prescribing to himself or his family. Wilson interviewed a Board representative and asked:

> But how would they know if he is using? He can get somebody else to prescribe him. I mean he could say, "I've followed the order." . . . . How do we, how do we know that he's, that we're not putting somebody right back out there to do the same thing he was doing before?

The Board representative responded:

> That's a very good question and why this order doesn't include drug testing, I, I honestly don't know the answer to that.

The broadcast then included a statement from Paul Jetton:

> I think it's just deplorable, I mean if, if it was another profession, uh, the guy would be in jail.

Wilson related a comment from Neely's attorney that

> two highly qualified neurosurgeons who reviewed the case agree with the medical decisions made by Dr. Neely. In addition, the [Board] investigated the Jetton case and found no wrong doing.

Wilson noted that Neely's hospital had a pending investigation regarding whether to continue Neely's privileges. The broadcast ended by noting that the Jettons settled their suit with Neely, Wu's suit was dismissed, the other suits remained pending, and the Board posts final decisions on its website.

6

After the report aired, Neely claims his practice collapsed. His referrals from other physicians dwindled, existing appointments cancelled (citing the broadcast as the reason for the cancellation), his income diminished, and his home went into foreclosure. He and his professional association (collectively "Neely") sued KEYE[6] for libel. KEYE moved for summary judgment, which the trial court granted without specifying the grounds. Neely raised seven issues in the court of appeals, three of which are relevant here: (1) the trial court erred generally by granting summary judgment; (2) the trial court erred because Neely had probative evidence on each element of his defamation claim; and (3) there is no rule in Texas shielding media defendants from liability simply because they accurately report defamatory statements made by a third party. 331 S.W.3d 900, 914. The court of appeals held that under *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990), none of the statements were actionable as a matter of law because KEYE accurately reported third-party allegations. 331 S.W.3d at 922, 926–28. The court of appeals affirmed the trial court's grant of summary judgment.[7] *Id.* at 928.

## II. Standard of Review

We review a trial court's grant of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The party moving for summary judgment bears the burden of proof. *Roskey v. Tex. Health Facilities Comm'n*, 639 S.W.2d 302, 303 (Tex. 1982). Though these burdens vary for traditional and no-evidence motions, the summary judgment motion

---

[6] Neely also sued Viacom, Inc., but the court of appeals held that Neely waived any challenge as to summary judgment dismissal of the claims against Viacom. 331 S.W.3d 900, 914. Neely does not contest that ruling here.

[7] The court of appeals also affirmed the trial court's exclusion of some of Neely's summary judgment evidence. 331 S.W.3d at 928–29. Neely does not challenge that ruling here.

7

here was a hybrid motion and both parties brought forth summary judgment evidence; therefore, the differing burdens are immaterial and the ultimate issue is whether a fact issue exists. *Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012). A fact issue exists if there is more than a scintilla of probative evidence. *See id.* at 527; TEX. R. CIV. P. 166a(c),(i). We must review the summary judgment record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). "In reviewing a summary judgment, we consider all grounds presented to the trial court and preserved on appeal in the interest of judicial economy." *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005). We have held that the constitutional concerns over defamation, discussed below, do not affect these summary judgment standards of review. *Casso v. Brand*, 776 S.W.2d 551, 555 n.3 (Tex. 1989).

### III. Discussion

### A. Competing Constitutional Concerns

The common law has long allowed a person to recover for damage to her reputation occasioned by the publication of false and defamatory statements. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11 (1990). Chief Justice Rehnquist noted that Shakespeare penned the rationale for the cause of action in Othello:

Good name in man and woman, dear my lord,

Is the immediate jewel of their souls.

Who steals my purse steals trash;

'Tis something, nothing;

8

'Twas mine, 'tis his, and has been slave to thousands;

But he that filches from me my good name

Robs me of that which not enriches him,

And makes me poor indeed.

WILLIAM SHAKESPEARE, OTHELLO, act 3 sc. 3, *quoted in Milkovich*, 497 U.S. at 12.  Unlike the federal Constitution, the Texas Constitution twice expressly guarantees the right to bring suit for reputational torts.  *See* TEX. CONST. art. I, §§ 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege."), 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person *or reputation*, shall have remedy by due course of law." (emphasis added)).

The right to recover for defamation, however, is not the only constitutional concern at stake.  Of significant import are the constitutional rights to free speech and a free press.  *See Cain v. Hearst Corp.*, 878 S.W.2d 577, 582 (Tex. 1994).  As the United States Supreme Court has articulated, "[w]hatever is added to the field of libel is taken from the field of free debate." *New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964).  To balance these competing interests, the United States Supreme Court through federal constitutional law, this Court through the common law, and the Legislature through statutes, have undertaken to tailor the tort of defamation so as to preserve the right to recover for reputational damages while minimally impinging on the rights to free speech and a free press.  *Cain*, 878 S.W.2d at 582.

### B. Elements of Defamation

The tort of defamation includes libel and slander. Libel occurs when the defamatory statements are in writing. TEX. CIV. PRAC. & REM. CODE § 73.001. Slander occurs when the statements are spoken. *Milkovich*, 497 U.S. at 17. The broadcast of defamatory statements read from a script is libel, not slander. *Christy v. Stauffer Publ'ns, Inc.*, 437 S.W.2d 814, 815 (Tex. 1969). Libel "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation . . . ." TEX. CIV. PRAC. & REM. CODE § 73.001.

We have revised the elements of the defamation cause of action in response to the United States Supreme Court's application of constitutional principles to defamation claims. Before *Sullivan*, 376 U.S. at 254, the defamation plaintiff generally prevailed by proving the defendant published a statement that defamed her unless the defendant proved the truth of the statement. Pierre N. Leval, *The No-Money, No-Fault Libel Suit: Keeping* Sullivan *in Its Proper Place*, 101 HARV. L. REV. 1287, 1287 (1988). But the Supreme Court held in *Sullivan* that freedom of expression requires "breathing space," and that if the plaintiff is a public official, she must prove the defendant had actual malice. 376 U.S. at 272, 279–80. The Court later held that public figures and limited purpose public figures must also prove actual malice, and that states may set their own level of fault for private plaintiffs.[8] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 347 (1974). The Court left the precise standard of fault to the states, and we have chosen a negligence standard for a private

---

[8] The Court also determined actual malice requires proof by clear and convincing evidence. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).

figure seeking defamation damages from a media defendant.[9] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *see also Gertz*, 418 U.S. at 353 (Blackmun, J., concurring) ("[T]he Court now conditions a libel action by a private person upon a showing of negligence, as contrasted with a showing of willful or reckless disregard."); RESTATEMENT (SECOND) OF TORTS § 580B (1977). In light of these holdings, to recover defamation damages in Texas, a plaintiff must prove the media defendant: (1) published a statement; (2) that defamed the plaintiff; (3) while either acting with actual malice (if the plaintiff was a public official or public figure) or negligence (if the plaintiff was a private individual) regarding the truth of the statement. *McLemore*, 978 S.W.2d at 571.

KEYE frames a central issue in this proceeding as the liability of a media defendant for republishing a third party's allegedly defamatory statements. We first observe that it is a well-settled legal principle that one is liable for republishing the defamatory statement of another. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973) (noting that a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own").[10] The rule's broad application has thus brought about efforts to soften its impact, such as the *Sullivan* and *Gertz* decisions requiring a showing of fault as well as the privileges and defenses described below. 1 ROBERT D. SACK, SACK ON DEFAMATION § 2.7.1 (3d ed. 2009).

---

[9] The majority of states have adopted a negligence standard for private figures, while Alaska, Colorado, Indiana, and New Jersey have adopted the actual malice standard for private figures. 1 RODNEY A. SMOLLA, LAW OF DEFAMATION § 3:31 (2d ed. 1991), *cited in* Kaitlin M. Gurney, *Myspace, Your Reputation: A Call to Change Libel Laws for Juveniles Using Social Networking Sites*, 82 TEMP. L. REV. 241, 251 & n.97 (2009).

[10] *See also* RESTATEMENT (SECOND) OF TORTS § 578 (1977) ("[O]ne who repeats or otherwise republishes defamatory material is subject to liability as if he had originally published it.");1 ROBERT D. SACK, SACK ON DEFAMATION § 2.7.1 (3d ed. 2009) ("'The common law of libel has long held that one who republishes a defamatory statement adopts it as his own and is liable [for false, defamatory statements] in equal measure to the original defamer.'" (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1298 (D.C. Cir. 1988)) (alteration in original)).

## C. Privileges and Defenses

The common law and statutes provide certain defenses and privileges to defamation claims. These include the defense of truth, TEX. CIV. PRAC. & REM. CODE § 73.005, which we have interpreted to require defendants to prove the publication was substantially true, *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). Moreover, statements that are not verifiable as false cannot form the basis of a defamation claim. *Milkovich*, 497 U.S. at 21–22. Further, the common law has recognized a judicial proceedings privilege since at least 1772 for parties, witnesses, lawyers, judges, and jurors.[11] Additionally, one cannot recover mental anguish damages for defamation of a deceased individual. *Renfro Drug Co. v. Lawson*, 160 S.W.2d 246, 250 (Tex. 1942); *see also* RESTATEMENT (SECOND) OF TORTS § 560 (1977). And a qualified privilege exists under the common law when a statement is made in good faith and the author, recipient, a third person, or one of their family members has an interest that is sufficiently affected by the statement. *Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 844 S.W.2d 198, 210 (Tex. 1992) (Hightower, J., concurring).

The United States Supreme Court, this Court, and the Legislature have afforded additional protections to media defendants. The United States Supreme Court and this Court long ago shifted the burden of proving the truth defense to require the plaintiff to prove the defamatory statements were false when the statements were made by a media defendant over a public concern.

---

[11] SACK, *supra* note 10, § 8.2.1 (citing *King v. Skinner*, 1 Lofft 55, 56, 98 Eng. Rep. 529, 530 (K.B. 1772), *quoted in Burns v. Reed*, 500 U.S. 478, 490 (1991)). We have long recognized this privilege in Texas. *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942).

12

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986); *McIlvain*, 794 S.W.2d at 15.[12]

This distinction is less material at the summary judgment stage where, as here, the media defendant is the movant. *See Casso*, 776 S.W.2d at 555 n.3.

Additionally, the Legislature has crafted the official/judicial proceedings privilege, which shields periodical publications from republication liability for fair, true, and impartial accounts of judicial, executive, legislative, and other official proceedings.[13]  TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1).  And the Legislature has also adopted the fair comment privilege, shielding periodical publications from republication liability for reasonable and fair comment on or criticism of official acts of public officials or other public concerns. *Id*. § 73.002(b)(2).

Notably, the Legislature has also added the due care provision for broadcasters, shielding them from liability unless the plaintiff proves the broadcaster failed to exercise due care to prevent publication of a defamatory statement. *Id*. § 73.004.  The provision requires that:

> A broadcaster is not liable in damages for a defamatory statement published or uttered in or as a part of a radio or television broadcast by one other than the broadcaster unless the complaining party proves that the broadcaster failed to exercise due care to prevent the publication or utterance of the statement in the broadcast.

---

[12] Neely admitted in his deposition that the public has a right to know about the Board's findings.  The parties do not dispute that the defendants are members of the media.  Thus, we hold that Neely must prove the falsity of the broadcast to recover damages. *Hepps*, 475 U.S. at 777.

[13] We previously noted that "we are reluctant to afford greater constitutional protection to members of the print and broadcast media than to ordinary citizens" because the "First Amendment affords equal dignity to freedom of speech and freedom of the press." *Casso*, 776 S.W.2d at 554.  But this understanding of the constitution is no impediment to the Legislature crafting additional protections for media defendants, which it has done in Chapter 73 of the Civil Practice and Remedies Code.

*Id.* We have previously commented that, under the due care provision, "[b]roadcasters are generally

not liable in defamation for broadcasts made by third parties." *Cain*, 878 S.W.2d at 582. A number

of other jurisdictions have enacted a due care provision, although some states require the defendant

broadcaster to prove it used due care (as opposed to our statute, which requires the plaintiff to prove

the defendant broadcaster did not use due care).[14] KEYE did not raise the due care provision at the

summary judgment stage, and thus it is not at issue in this proceeding.

Moreover, we note that this past regular session, the Legislature passed the Defamation

Mitigation Act, which requires defamation plaintiffs to request a correction, clarification, or

retraction from the publisher of a defamatory statement within the limitations period for the

defamation claim. TEX. CIV. PRAC. & REM. CODE §§ 73.051, .054–.055 (added by H.B. 1759, 83d

Leg., R.S., § 2). Under this provision, a defamation plaintiff may only recover exemplary damages

if she serves the request for a correction, clarification, or retraction within 90 days of receiving

knowledge of the publication.[15] *Id*. § 73.055(c).

### D. Substantial Truth

Whether Neely raised a fact issue regarding the truth or falsity of the underlying statements

is the primary issue in this appeal. We have developed the substantial truth doctrine to determine

the truth or falsity of a broadcast: if a broadcast taken as a whole is more damaging to the plaintiff's

---

[14] *See, e.g.*, CAL. CIV. CODE § 48.5(1); COLO. REV. STAT. § 13-21-106; FLA. STAT. § 770.04; GA. CODE ANN. § 51-5-10(a); IOWA CODE § 659.5; KY. REV. STAT. ANN. § 411.062; NEB. REV. STAT. § 25-840.02(1); OR. REV. STAT. § 31.200(1); S.D. CODIFIED LAWS § 20-11-6; UTAH CODE ANN. § 45-2-7; VA. CODE ANN. § 8.01-49; WYO. STAT. ANN. § 1-29-101.

[15] The Defamation Mitigation Act only affects publications published after its effective date and does not apply to this proceeding. H.B. 1759, 83d Leg., R.S., § 3.

reputation than a truthful broadcast would have been, the broadcast is not substantially true and is actionable. *Turner*, 38 S.W.3d at 115 ("the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements"); *McIlvain*, 794 S.W.2d at 16 ("The test used in deciding whether the broadcast is substantially true involves consideration of whether the alleged defamatory statement was more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have been. This evaluation involves looking to the 'gist' of the broadcast." (citations omitted)); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17 (1991) (applying substantial truth defense under California law).

Assessing a broadcast's gist is crucial. A broadcast with specific statements that err in the details but that correctly convey the gist of a story is substantially true. *Turner*, 38 S.W.3d at 115. On the other hand, a broadcast "can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Id*. at 114. We determine a broadcast's gist or meaning by examining how a person of ordinary intelligence would view it.[16] *Id*. at 114–15. "If the evidence is disputed, falsity must be determined by the finder of fact." *Bentley v. Bunton*, 94 S.W.3d 561, 587 (Tex. 2002).

KEYE contends the trial court properly granted summary judgment because: (1) KEYE accurately reported third-party allegations, which satisfies our test for substantial truth; (2) the broadcast is privileged under the fair comment and official proceeding privileges; (3) Neely is a

---

[16] We have also described this standard as the "average listener" standard. *McIlvain*, 794 S.W.2d at 16.

limited purpose public figure and there is no evidence of actual malice; (4) there is no evidence of negligence; and (5) Neely's professional association cannot maintain a defamation action. We address each argument in turn.

## 1. *McIlvain*

To address KEYE's first issue, we analyze our holding in *McIlvain*. KEYE contends that in *McIlvain*, we transformed the substantial truth doctrine to shield media defendants from defamation liability for publishing third-party allegations if the defendants show that the underlying allegations (1) were made, and (2) were accurately reported.

*McIlvain* concerned a broadcast about an investigation by the City of Houston into alleged misconduct by employees in its water maintenance division. 794 S.W.2d at 15. The broadcast indicated that the public integrity section was investigating allegations that: (1) employees cared for the elderly father of a manager on city time; (2) employees were putting in for overtime to complete their city duties later; (3) authorities were looking for a gun at a water treatment facility; and (4) employees had been drinking on the job. *Id*. Two of the employees sued the broadcasters for defamation. *Id*. The city's investigation later found all the allegations to be true. *Id*. at 16. The trial court granted summary judgment in favor of the media defendants. *Id*. at 15. We affirmed the trial court's ruling because the "broadcast statements are factually consistent with [the government's] investigation *and its findings*" and were thus "substantially correct, accurate, and not misleading." *Id*. at 16 (emphasis added).

Since *McIlvain*, several courts of appeals and the Fifth Circuit have interpreted it to mean that media reporting of third-party allegations under investigation is substantially true if the media

16

accurately reports the allegations and the existence of any investigation.[17] KEYE similarly asserts that our holding in *McIlvain* created a substantial truth defense for accurately reporting third-party allegations. But the parties do not assert and we cannot locate such a rule in any other jurisdiction. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 581A, cmt. e (1977). We did not establish a third-party allegation rule in *McIlvain*. Rather, we measured the truth of the allegations in *McIlvain* against the government investigation that found them to be true. *Id.* In other words, a government investigation that finds allegations to be true is one of many methods of proving substantial truth. But we do not foreclose the possibility that the gist of some broadcasts may merely be allegation reporting, such that one measure for the truth of the broadcast could be whether it accurately relayed the allegations of a third party. *See, e.g.*, *Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 986 (7th Cir. 2004) (broadcast that government was investigating a nonprofit organization's alleged funding of terrorism was substantially true based upon government affidavits indicating it was investigating the reported allegations). As addressed below, even if we adopted such a rule today, it could not enable KEYE to prevail here because there is a genuine issue of material fact as to whether Neely was disciplined for the conduct the broadcast suggests.[18]

---

[17] *See Green v. CBS, Inc.*, 286 F.3d 281, 284 (5th Cir. 2002); 331 S.W.3d at 922; *Grotti v. Belo Corp.*, 188 S.W.3d 768, 775 (Tex. App.—Fort Worth 2006, pet. denied); *Associated Press v. Boyd*, No. 05-04-01172-CV, 2005 WL 1140369, at *3 (Tex. App.—Dallas May 16, 2005, no pet.); *UTV of San Antonio, Inc. v. Ardmore, Inc.*, 82 S.W.3d 609, 612 (Tex. App.—San Antonio 2002, no pet.); *Dolcefino v. Randolph*, 19 S.W.3d 906, 918 (Tex. App.—Houston [14th Dist] 2000, pet. denied); *Am. Broad. Cos., Inc. v. Gill*, 6 S.W.3d 19, 33 (Tex. App.—San Antonio 1999, pet. denied); *KTRK Television v. Felder*, 950 S.W.2d 100, 106 (Tex. App.—Houston [14th Dist.] 1997, no writ).

[18] As amicus The Dallas Morning News observes, our ruling that *McIlvain* did not create a third-party allegation rule does not necessarily mean the previous cases misinterpreting *McIlvain* reached incorrect results. Specifically, The Dallas Morning News observes that the following cases nonetheless properly held that the gist of the statements were substantially true: *Green*, 286 F.3d at 284–85; *Boyd*, 2005 WL 1140369, at *3; *Ardmore, Inc.*, 82 S.W.3d at 612; *Randolph*, 19 S.W.3d at 921. Amicus Br. of The Dallas Morning News on Rehearing, at 8–11.

17

## 2. Gist of the Broadcast

The broadcast at issue began by asking listeners if they would want to know "if your surgeon had been disciplined for prescribing himself and taking dangerous drugs."[19] The broadcast discusses the Jetton and Wu cases and then states that the Board "did discipline Neely." After discussing the Order, the broadcast contains the following statement by Paul Jetton:

> Narcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people. I mean it's just, even now I'm just, it's just incredulous, you just can't even believe that it even happened.

Wilson then asked a Board representative how the Board would know Neely was not using the medications again: "But how would they know if he is using? He can get somebody else to prescribe him. I mean he could say, 'I've followed the order.'"

We determine the gist through the lens of a person of ordinary intelligence. *Turner*, 38 S.W.3d at 114–15. Neely asserts that a person of ordinary intelligence could conclude that the gist of the broadcast, based on the content and placement of these statements, was that Neely was disciplined for operating on patients while using dangerous drugs or controlled substances.[20] KEYE maintains that the gist of the broadcast "concerned controversies and allegations surrounding Neely's care of Jetton and Wu, the malpractice lawsuits filed by Jetton and Wu's ex-wife, an autopsy

---

[19] We have previously stated that an introduction can be especially misleading. *See Turner*, 38 S.W.3d at 118.

[20] Neely also asserts the broadcast includes gists that he was performing unnecessary surgeries and was unsafely operating on patients while experiencing hand tremors. We need not assess the substantial truth of the gist that Neely was performing unnecessary surgery because these statements are protected by the official/judicial proceedings privilege. *See infra* Part III.E. And we need not assess the gist regarding Neely's hand tremors in light of our disposition regarding the gist that he was disciplined for operating on patients while using dangerous drugs and controlled substances. *See infra* Part III.D.3–III.F.

report by the Travis County [Medical Examiner], a public disciplinary action by the Medical Board, and Neely's responses to the allegations." We agree with Neely that a person of ordinary intelligence could conclude the gist of the broadcast was that Neely was disciplined for operating on patients while using dangerous drugs or controlled substances.

### 3. Substantial Truth of the Broadcast's Gist

To prevail at summary judgment on the truth defense, KEYE must conclusively prove that this gist is substantially true.[21] *Turner*, 38 S.W.3d at 114–15. As we explained in *Turner*, although the specific statements in a broadcast may be substantially true when viewed in isolation, the gist can be false by omitting or juxtaposing facts. *Id.* We examine whether the gist was more damaging to the plaintiff's reputation, in the mind of a person of ordinary intelligence, than a truthful statement would have been. *Id.*

A reasonable view of the gist of the broadcast is that Neely was disciplined for operating on patients while using dangerous drugs or controlled substances. Unlike in *McIlvain*, the government investigation (here from the Board Order) does not indicate that this allegedly defamatory statement was correct. The Order disciplined Neely for prescribing himself dangerous drugs or controlled substances. It did not discipline Neely for *taking or using* dangerous drugs or controlled substances. The Board found that Neely's medications were "legitimately and appropriately prescribed" by treating physicians but that Neely "began to refill the medications himself in lieu of scheduled visits." Further, section 164.051(a)(4) of the Occupations Code allows the Board to suspend a

---

[21] When a private figure sues a media defendant over defamatory statements that are of public concern, the plaintiff has the burden of proving falsity. *Hepps*, 475 U.S. at 777. But this distinction is less material at summary judgment. *Casso*, 776 S.W.2d at 555 n.3.

19

license if the physician is unable to practice medicine with reasonable skill and safety to patients because of "excessive use of drugs" or "mental or physical condition." TEX. OCC. CODE § 164.051(a)(4)(C)–(D). When citing to section 164.051(a)(4), the Order only noted Neely's "mental or physical condition" as grounds for discipline, not any excessive use of drugs. And rather than concluding that Neely's self-prescribing affected his ability to practice medicine (as it apparently did with his mental or physical condition), the Board concluded that Neely's self-prescribing instead violated a then newly-created rule that self-prescribing dangerous drugs or controlled substances in certain situations is not "an acceptable professional manner consistent with public health and welfare." 22 TEX. ADMIN. CODE § 190.8(1)(M) (Tex. State Bd. of Med. Examiners, Disciplinary Guidelines) (added by 28 Tex. Reg. 10496 (2003)). Thus, the Order reflects that Neely was disciplined for self-prescribing dangerous drugs or controlled substances, not for taking them.

In addition, Neely brought forth evidence that he was not operating on patients while taking or using dangerous drugs or controlled substances:

- Neely swore in an affidavit that he had "never abused drugs or been addicted to drugs, prescription or otherwise" and had "never performed surgeries while impaired by drugs."[22]

- Wilson reported not finding any independent evidence that Neely performed surgery while impaired.

[22] Uncontroverted summary judgment evidence from an interested witness is only sufficient to raise a fact issue, unless the evidence is clear, direct, positive, can be readily controverted, and there are no circumstances tending to impeach or discredit the testimony. *See* TEX. R. CIV. P. 166a(c); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965). Because Neely's evidence is only used to raise a fact issue here, we need not assess whether his testimony is clear, direct, positive, can be readily controverted, or could be impeached or discredited.

- Neely retained Dr. Edgar Nace—a former vice president of the Board who was board certified in clinical, addiction, and forensic psychiatry—to conduct a psychiatric and substance abuse evaluation of Neely during the Board investigation. Among other things, Nace reviewed Neely's pharmacy records and performed a drug test. Nace determined that Neely "has not been and is not currently diagnosable with a substance use disorder—neither abuse nor dependence." Nace noted that Neely's dosage of hydrocodone was lower than with emerging patterns of abuse or addiction and Neely's use of only one pharmacy was inconsistent with a pattern of abuse or addiction. Nace concluded that Neely's "prescriptions and subsequent refills have been appropriate to his documented diagnosis" for a torn rotator cuff, diverticulitis, and asthma.

- Neely used hydrocodone primarily in 2000 and part of 2001 to treat a torn rotator cuff. He ceased using hydrocodone in April 2003.

- Neely ceased using steroids, prescribed for asthma, in 2000, when he began using an inhaler.

- As of October 2003, Neely was using medications for asthma (Advair, Ventolin), allergies (Actifed, Benadryl, Flonase), high blood pressure (Cardura), and colon issues (Lomotil), none of which are controlled substances.

Based on Neely's responsive evidence,[23] we hold that a there is a fact issue regarding the truth or falsity of the gist that Neely was disciplined for operating on patients while taking or using

---

[23] Neely also offered other evidence the trial court excluded, which Neely does not challenge on appeal. This evidence included: (1) the Board orders finding no wrongdoing with Neely's treatment in the Jetton and Wu cases; (2) Neely's statement that he only took narcotic medications at night; (3) the psychiatric evaluation conducted pursuant to the Board Order that concluded that Neely's "use of the self-prescribed opiates does not suggest that he ever had a problem with abuse or dependence;" and (4) the fact that the Board terminated its Order early, less than half way through the three-year probationary period.

21

dangerous drugs or controlled substances. *Turner*, 38 S.W.3d at 117–18 (holding that, especially in light of a broadcast's introduction, a viewer could believe in a gist of the broadcast that was not substantially true); *McIlvain*, 794 S.W.2d at 16. As in *Turner*, we note that even an accurate account of Neely that did not create a false impression "may have raised troubling questions." 38 S.W.3d at 118. But because the factfinder may conclude that the gist was more damaging to Neely's reputation than a truthful and accurate broadcast would have been, the substantial truth defense cannot support the trial court's summary judgment.

### E. Official/Judicial Proceedings Privilege

KEYE next asserts that the trial court's grant of summary judgment was proper because the broadcast was protected by the official/judicial proceedings privilege. The United States Supreme Court has long recognized a common law judicial privilege. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975). Underpinning the judicial privilege is the notion that a "trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt." *Craig v. Harney*, 331 U.S. 367, 374 (1947). In Texas, the Legislature codified the judicial proceedings privilege and expanded it to other official proceedings. Section 73.002 of the Civil Practice and Remedies Code provides that publications are privileged if they are "a fair, true, and impartial account of" judicial or other proceedings to administer the law. TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1).

The official/judicial proceedings privilege assesses whether the reporter's account of the proceedings (not the underlying allegations made in those proceedings) was fair, true, and impartial.

22

*Denton Publ'g Co. v. Boyd*, 460 S.W.2d 881, 883 (Tex. 1971). When construing a substantially similar prior version of the official/judicial proceedings privilege, we held that "[t]he publication would be within the privilege provided by statute as long as it purported to be, and was, only a fair, true and impartial report of what was stated at the meeting, regardless of whether the facts under discussion at such meeting were in fact true . . . ." *Id.* at 882; *see also Herald-Post Publ'g Co. v. Hill*, 891 S.W.2d 638, 639 (Tex. 1994) (comparing allegedly defamatory article to trial testimony to determine that judicial proceeding privilege applied).

But the privilege only extends to statements that: (1) are substantially true and impartial reports of the proceedings, and (2) are identifiable by the ordinary reader as statements that were made in the proceeding. *Boyd*, 460 S.W.2d at 884. In *Boyd*, there was a factual dispute as to whether a false statement that a contractor was bankrupt was made at a city council meeting. *Id*. at 884–85. When remanding to resolve the factual dispute, we concluded the privilege would apply if: (1) the statement was made at the city council meeting, and (2) an ordinary reader of the defendant's article would understand the statement was made at the meeting.[24] *Id*. at 885.

### 1. Unnecessary Surgery

One gist of the KEYE broadcast we have not previously addressed is that Neely was performing unnecessary surgeries.[25] This gist results from the inclusion of the statement by Sheila that "[e]very neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have

---

[24] We see no substantive difference from our ordinary reader standard for the judicial proceedings privilege in *Boyd*, 460 S.W.2d at 884–85, and our person of ordinary intelligence standard for substantial truth in *Turner*, 38 S.W.3d at 114–15.

[25] *See supra* note 20.

23

[sic] said they would have never done surgery. They would have watched him with MRIs over years." The placement of this statement within the broadcast was in the discussion of Neely's treatment of Paul and the resulting lawsuit. The allegation that Neely performed unnecessary surgery was one basis for the lawsuit, in which the Jettons alleged that, "[a]t the time [Neely and a fellow doctor] performed such procedure, they ostensibly did so to treat symptomatic hydrocephalus in Paul Jetton. However, Paul Jetton did not have symptomatic hydrocephalus." We hold that an ordinary viewer could conclude that Sheila's allegation regarding unnecessary surgery in the broadcast was made in the Jetton lawsuit. *Id.* at 884. Thus, KEYE met its initial burden of proving this statement is protected by the conditional judicial proceedings privilege. *See id.* (holding that the defendant has the initial burden of proving a publication is privileged).

But Neely can rebut the privilege by proving it is inapplicable. *Id.* The judicial/official proceedings privilege "does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern." TEX. CIV. PRAC. & REM. CODE § 73.002(a). Actual malice means the defendant made the statement "'with knowledge that it was false or with reckless disregard of whether it was true or not;'" and reckless disregard means "'the defendant in fact entertained serious doubts as to the truth of his publication.'" *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 162 (Tex. 2004) (quoting *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000) and *Bentley*, 94 S.W.3d at 591); *see also Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005). Sheila's statement that every neurosurgeon would have not performed surgery was controverted by the two neurosurgeons who agreed with Neely's treatment of Paul and the Board order finding no wrongdoing in Neely's treatment of Paul. KEYE's

24

inclusion of this disclaiming information negates any allegation that KEYE acted with actual malice as to the gist of the broadcast that Neely was performing unnecessary surgery and the record contains no other evidence that creates a fact issue on this point. Accordingly, the official/judicial proceedings privilege shields this portion of the broadcast. TEX. CIV. PRAC. & REM. CODE § 73.002(a); *Boyd*, 460 S.W.3d at 884.

### 2. Disciplined for Operating on Patients While Taking Dangerous Drugs or Controlled Substances

We next analyze whether the gist of the broadcast that Neely was disciplined for operating on patients while taking dangerous drugs or controlled substances is protected by the official/judicial proceedings privilege. This gist is explained in part by the anchor's introduction to the broadcast, which asked:

> If you needed surgery would you want to know if your surgeon had been disciplined
> for prescribing himself and taking dangerous drugs . . . ?

As previously addressed, the evidence creates a fact issue as to whether the assertion that Neely had been disciplined for "taking dangerous drugs" is a fair, true, and impartial account of the Board Order. The Board found Neely's *self-prescribing* to be inappropriate—not his taking or using the medications. The Board found that the medications were "legitimately and appropriately prescribed" but that Neely "began to refill the medications himself in lieu of scheduled visits." Accordingly, a jury may conclude that the Order disciplined Neely for his "inappropriate prescription of dangerous drugs or controlled substances to oneself." Thus, we cannot say that—as

25

a matter of law—the statement that Neely was disciplined for taking or using dangerous drugs or controlled substances was a fair, true, and impartial account of an official or judicial proceeding. *Boyd*, 460 S.W.3d at 883.

## F. Fair Comment Privilege

KEYE also maintains that the fair comment privilege applies to the broadcast. Section 73.002(b)(2) provides that a broadcast is privileged if it is a "reasonable and fair comment on or criticism of an official act of a public official or other matter of public concern published for general information." TEX. CIV. PRAC. & REM. CODE § 73.002(b)(2). Comments based on substantially true facts are privileged if fair; comments that assert or affirm false statements of fact are not privileged. We long ago stated that it "is the settled law of Texas, that a false statement of fact concerning a public officer, even if made in a discussion of matters of public concern, is not privileged as fair comment." *Bell Publ'g Co. v. Garrett Eng'g Co.*, 170 S.W.2d 197, 204 (Tex. 1943); *see also Barbouti v. Hearst Corp.*, 927 S.W.2d 37, 52 (Tex. App.—Houston [1st] 1996, writ. denied) (false statements not privileged as fair comments). The Legislature has extended the fair comment privilege to matters of public concern,[26] TEX. CIV. PRAC. & REM. CODE § 73.002(b)(2), and we have come to interpret the truth defense as requiring only substantial truth, *Turner*, 38 S.W.3d at 115. Substantial truth assesses whether the gist of the broadcast is substantially true, and a broadcast can convey a substantially false meaning by juxtaposing facts that, viewed in isolation, are true. *Id.* Joining these principles, we conclude that a comment based on a substantially true statement of fact can qualify as a fair comment. TEX. CIV. PRAC. & REM. CODE § 73.002(b)(2). But if a comment is

---

[26] As we noted above, this broadcast addressed a matter of public concern. *See supra* note 12.

26

based upon a substantially false statement of fact the defendant asserts or conveys as true, the comment is not protected by the fair comment privilege. *Bell*, 170 S.W.2d at 204.

KEYE's broadcast opened by asking viewers if they would want to know if their doctor "had been disciplined for prescribing himself and taking dangerous drugs . . . ." Wilson's questioning of whether the Order would prevent Neely from using the drugs was predicated on the statement that Neely had been disciplined for taking or using dangerous drugs or controlled substances—which the broadcast affirmed to be true. Because a fact issue exists on whether the statement was true, KEYE is not entitled to summary judgment based on the fair comment privilege. *Bell*, 170 S.W.2d at 204.

### G. Limited Purpose Public Figure

KEYE also asserts that Neely was a limited purpose public figure who therefore had to prove malice. We disagree.

Public figure status is a question of law for the court. *McLemore*, 978 S.W.2d at 571. We use a three-part test to assess whether an individual is a limited purpose public figure:

(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) the plaintiff must have more than a trivial or tangential role in the controversy; and

(3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Id.* In *McLemore*, we expressly reserved the question of whether an individual may meet the public controversy requirement against her will. *Id.* at 571–72.

27

The distinction between public and private figures matters chiefly because public and limited purpose public figures must prove a defamation defendant acted with actual malice. *Gertz*, 418 U.S. at 342. The United States Supreme Court addressed this distinction in *Gertz*:

> [p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.
>
> More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. . . .
>
> Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id*. at 344–45. Thus, the Court was concerned with both access to communication to rebut a defamatory statement and the normative considerations of public figures typically having "thrust themselves to the forefront of particular public controversies." *Id*. at 345. The Court later stated that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). In other words,

28

the allegedly defamatory statement cannot be what brought the plaintiff into the public sphere; otherwise, there would be no private figures defamed by media defendants.

The Court's forecast that it would be "exceedingly rare" for a person to become a public figure involuntarily has proven true: neither the United States Supreme Court nor this Court has found circumstances in which a person involuntarily became a limited-purpose public figure. *See, e.g.*, *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 166 (1979) (holding an individual to not be a limited-purpose public figure who was "dragged unwillingly into the controversy"); *Time, Inc. v. Firestone*, 424 U.S. 448, 454–55 (1976) (holding an individual to not be a public figure, in part, because she had done nothing voluntary to assume special prominence).

On these facts, we cannot say this is the exceedingly rare case in which a person has become a limited-purpose public figure against his will. Before the broadcast in question, Neely was mentioned in a 1996 newspaper article about settling a malpractice lawsuit and a December 2003 newspaper statement that Neely was placed on probation for self-prescribing medications. Neely was not quoted in either article. Neely also refrained from talking to Wilson regarding the broadcast at issue. Because Neely is not a limited-purpose public figure, he need not prove actual malice, and this ground cannot support the trial court's summary judgment.

### H. Evidence of Negligence

KEYE next argues that the trial court properly granted summary judgment because there was no evidence of negligence. For the purposes of defamation liability, a broadcaster is negligent if she knew or should have known a defamatory statement was false. *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 820 (Tex. 1976). But that liability may not be predicated on "a factual

29

misstatement whose content [would] not warn a reasonable prudent editor or broadcaster of its defamatory potential.'" *Id.* (quoting *Gertz*, 418 U.S. at 348) (alteration in original).

The broadcast opened by asking viewers if they would want to know if their doctor "had been disciplined for prescribing himself and taking dangerous drugs . . . ." Neely raised a fact issue as to the truth or falsity of the gist that he was disciplined for taking medications. *See supra* Parts III.D.3 and III.E. This creates a fact issue regarding whether the statement in the broadcast that Neely had been disciplined for taking medication would warn a reasonably prudent broadcaster of its defamatory potential. *Foster*, 541 S.W.2d at 820.

### I. Professional Association

Finally, KEYE argues that professional associations cannot maintain defamation claims and thus the claim by Neely's professional association must be dismissed. We disagree.

Our precedent makes clear that corporations may sue to recover damages resulting from defamation. *Gen. Motors Acceptance Corp. v. Howard*, 487 S.W.2d 708, 712 (Tex. 1972); *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960). In *Howard*, Howard Motor Company, Inc. and its owner, Hugh Howard, both sued General Motors Acceptance Corporation (GMAC), alleging it had libeled them in a letter to Howard's bank. 487 S.W.2d at 709–10. GMAC argued that our holding in *Matthews* precludes corporations from maintaining causes of action for libel. *Id.* at 712. We rejected that assertion, pointing out that *Matthews* specifically recognized that a corporation may be libeled. *Id.* Accordingly, we permitted Howard Motor Company, Inc., a corporate entity, to maintain a libel suit against GMAC. *See id.*

30

The Legislature has endowed professional associations with many of the same privileges that corporations enjoy. Indeed, the Business Organizations Code specifies that, "[e]xcept as provided by Title 7, a professional association has the same powers, privileges, duties, restrictions, and liabilities as a for-profit corporation." TEX. BUS. ORGS. CODE § 2.108. Nothing in Title 7 of the Business Organizations Code precludes professional associations from bringing defamation suits. *See id*. chs. 301–02. Because professional associations share the same rights as for-profit corporations as to maintaining defamation claims, Texas law does not preclude the professional association, Byron D. Neely, M.D., P.A., from maintaining a libel suit.[27]

## IV. Response to the Dissent

The dissent would hold that the broadcast was substantially true as a matter of law because there was circumstantial evidence that Neely could have been under the influence of dangerous drugs and controlled substances while operating on patients, and that the Board, though not expressly disciplining Neely for taking medications, implicitly did so. __ S.W.3d __, __ (Jefferson, C.J., dissenting). But at summary judgment, "[w]e must review the record '*in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion*.'" *Buck*, 381 S.W.3d at 527 (quoting *City of Keller*, 168 S.W.3d at 824) (emphasis added). The dissent disregards these principles in two ways. First, the dissent ignores Neely's evidence, which includes the Board Order indicating its discipline of him was not for his use of

---

[27] While professional associations may maintain defamation claims, recovery by the association and its members for the same particular injury is a precluded double recovery. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006) ("There can be but one recovery for one injury, and the fact that . . . there may be more than one theory of liability[] does not modify this rule." (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex. 1991)) (alterations in original)). Instead, it is for the trier of fact to simply determine what portion, if any, of the total damages inflicted were incurred by each entity.

medications, evidence that Neely never performed surgery while impaired, that his evaluation prior to the Board Order indicated he never had a drug abuse or dependence problem, and that Wilson never found any independent evidence that Neely performed surgery while impaired.[28]

Second, the dissent inverts our time-honored summary judgment standard by indulging every reasonable inference and resolving every doubt against Neely. Its foremost implicit finding against Neely is that the Board disciplined him for taking medications. __ S.W.3d at __ (Jefferson, C.J., dissenting). The dissent indicates that it "is not hard to understand the Board's concerns" regarding Neely's use of medications. *Id.* But the Board Order did not discipline Neely for taking medications, it disciplined him for self-prescribing them. The Order states, in relevant part:

### FINDINGS OF FACT

. . .

6. [Neely] suffered various injuries and ailments, which required a variety of medications. [Neely's] treating physician legitimately and appropriately prescribed a number of medications to treat these conditions. However, between 1999, and 2002, [Neely] began to refill the medications himself in lieu of scheduled visits.

7. Upon review of statements of [Neely] and the September 27, 2000 medical records of [Neely] obtained from his treating physician, the Panel concluded that [Neely] had a prior history of tremors.

. . .

### CONCLUSIONS OF LAW

---

[28] The dissent believes this evidence that Neely was not operating while impaired is immaterial to the gist of whether he was disciplined for operating on patients while taking dangerous drugs. __ S.W.3d at __ (Jefferson, C.J., dissenting). This is precisely why we first examined the Board Order itself to determine whether it disciplined Neely for the conduct the gist of the broadcast indicates. *See supra* Part III.D.3. Neely's additional evidence supports why the Order did not discipline him for operating on patients while taking dangerous drugs. And if evidence of Neely's use of medication is truly as irrelevant as the dissent suggests, one wonders why the dissent only finds support in this very type of evidence.

. . .

> 2. [Neely] is subject to action by the Board under Sections 164.051(a)(4) and 164.056 of the Act due to [Neely's] inability to practice medicine with reasonable skill and safety to patients, *due to mental or physical condition.*

> 3. [Neely] is subject to disciplinary action pursuant to Section 164.051(a)(3) of the Act by committing a direct or indirect violation of a rule adopted under this Act, either as a principal, accessory, or accomplice, to wit, Board Rule 190.1(c)(1)(M)—*inappropriate prescription of dangerous drugs or controlled substances* to oneself, family members, or others in which there is a close personal relationship.

(Emphases added.) The first conclusion of law above references section 164.051(a)(4) of the Occupations Code, which allows the Board to discipline a person for illness, drunkenness, "excessive use of drugs, narcotics, chemicals, or another substance," or "a mental or physical condition." TEX. OCC. CODE § 164.051(a)(4). The Order states that it was disciplining Neely "due to mental or physical condition"—not excessive drug use as the dissent reads between the lines to infer.[29] At a minimum, the Order at least creates a fact issue in Neely's favor as to whether he was disciplined for taking medications. If one does endeavor to draw inferences and resolve doubts, they

---

[29] The dissent relies on a statement by a Board investigator in its "summary of allegations" that Neely could be subject to disciplinary action under section 164.051(a)(4) for "[i]nability to practice medicine with reasonable skill and safety because of illness *or* substance abuse"(emphasis added), and a statement on the Board's website that its investigation of Neely "was based on *allegations* that Dr. Neely had self-prescribed medications with the *potential* to interfere with his ability to perform surgery." __ S.W.3d at __ (Jefferson, C.J., dissenting) (emphases added). The Board Order ultimately did not discipline Neely under section 164.051(a)(4) for substance abuse but only for a "mental or physical condition," which was his hand tremor. Though the Board did not discipline Neely for taking medications, a reasonable view of the gist of the broadcast was that Neely had been so disciplined.

must be drawn and resolved in favor of Neely at this summary judgment stage.[30] *Buck*, 381 S.W.3d at 527.

In addition, the dissent further draws inferences against Neely by assuming that the Board's order for Neely to undergo a psychiatric evaluation indicates the Board must have been concerned about Neely's use of medications. On the contrary, the Board Order notes that Neely retained a doctor to perform a physical examination who detected no medically significant tremor but "felt unqualified to determine [Neely's] ability to perform surgery, and recommended a disability assessment or a Neuro-psyche evaluation." Neely then retained Dr. Nace to perform the psychiatric evaluation the physical examination recommended. The Board then followed the same model, "requesting independent physical and psychiatric evaluations to determine [Neely's] capacity to practice medicine in general, and specifically, to perform surgery." Far from disciplining Neely for operating on patients while taking medications, the Order simply confirmed a psychiatric evaluation was needed because a physical evaluation alone might not fully assess the impact of Neely's hand tremor on his ability to perform surgery.

Moreover, by inverting the standard of review for summary judgments, the dissent prematurely cuts off Neely's right to a trial on this reputational tort. Our constitution assures that the "right of trial by jury shall remain inviolate." TEX. CONST. art. I, § 15. Additionally, the Texas Constitution's free speech clause guarantees the right to bring reputational torts: "Every person shall

---

[30] In its effort to indulge reasonable inferences against Neely, the dissent also relies on an Austin American Statesman article that indicates Neely was one of six Austin doctors the Board had recently disciplined for "violations involving either drug or alcohol abuse." __ S.W.3d at __ (Jefferson, C.J., dissenting). But the specific reference to Neely was that he was disciplined "for self-prescribing medications, according to board records." We find nothing questionable about this specific reference to Neely. Nor does the gist of the article appear to be that Neely was disciplined for operating on patients while using dangerous drugs and controlled substances.

34

be at liberty to speak, write or publish his opinions on any subject, *being responsible for the abuse of that privilege . . . .*" TEX. CONST. art. I, § 8 (emphasis added). Likewise, the open courts provision guarantees the right to bring reputational torts: "All courts shall be open, and every person for an injury done him, in his lands, goods, person or *reputation*, shall have remedy by due course of law." TEX. CONST. art. I, § 13 (emphasis added). As we observed in *Casso*,

> While we have recently recognized the possibility that our state free speech guarantee may be broader than the corresponding federal guarantee, *that broader protection, if any, cannot come at the expense of a defamation claimant's right to redress*. Unlike the United States Constitution, which contains no explicit guarantee of the right to sue for defamation, the Texas Constitution expressly protects the bringing of reputational torts.

776 S.W.2d at 556 (emphasis added) (citation omitted). In short, the dissent's upending of our time-honored summary judgment principles infringes upon Neely's constitutional right to bring suit for reputational torts and to have a jury trial.

The dissent also attempts to use a discrete portion of the broadcast that, standing alone, could appear to be substantially true to vindicate the remainder of the broadcast. The dissent focuses on the portion of the broadcast addressing Neely's hand tremors as justification for the broadcast being substantially true as a matter of law. But the broadcast references Neely's hand tremors twice in the seven-minute segment. Drugs or medications are expressly referenced eight times and discussed without naming those precise terms a number of other times. The dissent's analysis falls short of respect for our precedent dictating the manner in which we review substantial truth. *Turner*, 38 S.W.3d at 115 ("[T]he meaning of a publication, and thus whether it is false and defamatory,

35

depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.").

Additionally, the dissent contends that a report about a government investigation is always substantially true. __ S.W.3d at __ (Jefferson, C.J., dissenting). In Texas, the Legislature long ago protected reports about government investigations under the official/judicial proceedings privilege. TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1). But as explained above, the privilege only protects such reports if they are fair, true, and impartial accounts of such proceedings. *Id.* There is at least a fact issue on whether the broadcast was a fair, true, and impartial account of the Board Order because the gist of the broadcast to a person of ordinary intelligence could be that Neely was disciplined for taking dangerous drugs and controlled substances when the Order indicates he was not so disciplined.[31] *See* Part III.E, *supra*.

Finally, the dissent perceives that our holding "collides violently with the First Amendment." __ S.W.3d at __ (Jefferson, C.J., dissenting). But the United States Supreme Court has only discussed the truth defense as a creature of state common law and not the First Amendment. *Masson*, 501 U.S. at 516 ("The common law of libel . . . overlooks minor inaccuracies and concentrates upon substantial truth."). Accordingly, the only collision is between the dissent's implicit findings and our six-decade-old standard for reviewing summary judgments. *See*

_____

[31] The dissent's reliance on *Global Relief Foundation*, 390 F.3d at 973, only furthers our conclusion. There, the New York Times prevailed on the truth defense because it was substantially true that the government was suspicious about Global Relief funding terrorism. *Id.* at 986. Global Relief's affidavits indicating it did not fund terrorism did not render false the media statements about the government's suspicions. *Id.* at 983. The present case would be more akin to the New York Times reporting that Global Relief had been convicted of something it had not been convicted of. *See id.* at 987 ("none of the articles concluded that [Global Relief] was actually guilty of the conduct for which it was being investigated").

*Gulbenkian v. Penn*, 252 S.W.2d 929, 931 (Tex. 1952) (requiring a trial court at summary judgment to give the nonmovant "the benefit of every reasonable inference which properly can be drawn in favor of his position" and that if "a mere ground of inference" supports the motion, it will not be granted).

## V. Conclusion

The key question in this appeal is whether Neely raised a fact issue as to the truth or falsity of the broadcast at issue in his defamation suit. We examine substantial truth based on what a person of ordinary intelligence would understand the gist or meaning of the broadcast to be. Here, a person of ordinary intelligence could conclude that the gist of the broadcast was that Neely was disciplined for operating on patients while using dangerous drugs and controlled substances. Neely raised a genuine issue of material fact as to the truth or falsity of that gist with evidence that he was not disciplined for taking dangerous drugs or controlled substances and he never performed surgery while using dangerous drugs or controlled substances. We further conclude: (1) there are fact issues on whether part of the broadcast is protected by the judicial/official proceedings or fair comment privileges; (2) Neely was not a limited purpose public figure; (3) Neely raised a fact issue as to KEYE's negligence; and (4) Neely's professional association may maintain a cause of action for defamation. We reverse the judgment of the court of appeals and remand the case to trial court for further proceedings consistent with this opinion.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED:** June 28, 2013

38

**KEYE January 19, 2004 Broadcast**

**Fred Cantu (Anchor):** If you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs, had a history of hand tremors and had been sued several times for malpractice in the last few years?

**Judy Maggio (Anchor):** A central Texas couple says they didn't learn about this until it was too late. They're outraged the [Texas Medical Board] is allowing Dr. Byron Neely to continue to practice. KEYE news investigative reporter Nanci Wilson tells us if you go to St. David's Hospital with a head injury you could be Dr. Neely's next patient.

**Paul Jetton:** I've been in, in and out of the hospital, you know, for the last four years. Uh, I had twelve, I believe, I've even lost count, I believe twelve brain surgeries, one spinal surgery.

**Wilson:** This is Paul Jetton's life.

**Paul Jetton:** I can't walk. You know, I still, I can walk with a walker, but I still can't walk on my own.

**Wilson:** Each step is a struggle, but it wasn't always this way. In 1982 Paul Jetton was a linebacker for the University of Texas. He was so good he went on to play in the pros. His first year with the Cincinnati Bengals the team went to the Super Bowl. But in 1999 . . .

**Paul Jetton:** I just wasn't feeling well. When I went, you know, for I just wanted to get a physical.

**Wilson:** Something unusual showed up on the MRI scan of his brain.

**Paul Jetton:** He told me that I had this, this tumor in my brain and, and that I had to, had to have it operated on.

**Wilson:** His doctor, Austin neurosurgeon Byron Neely, who has been in practice since 1977, said an operation would help.

**Paul Jetton:** You know it would only be a two hour surgery and that I'd be in, I'd only be in the hospital for two or three days and I'd go on with the rest of my life.

**Wilson:** The two hour surgery stretched into almost eight hours and Paul was in the hospital for six weeks. While in the hospital Paul developed an infection in his brain. However, he was discharged from the hospital anyway. The result: numerous surgeries and a life of disability. Paul's wife, Sheila, says what they learned from other doctors was the final blow.

**Sheila Jetton:** Every neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have [sic] said they would have never done surgery. They would have watched him with MRIs over years.

**Wilson:** The Jettons aren't the only patients to raise questions about Dr. Neely. Wei Wu, a software engineer with two PhDs was referred to Dr. Neely. Neely explains the case in this deposition from 2002.

**Dr. Neely:** [From the video of his deposition] He came in very confused one day, uh, was found to have a uh, very major brain tumor thought to be a meningioma at the time because it, of the location in the brain. Uh, the patient was taken to the OR thereafter and found to malignant melanoma [sic].

**Wilson:** Peter Gao was a friend of Wei Wu's. Gao says Wu struggled with the diagnosis that Wu had only a few months to live.

**Peter Gao:** The doctor is more like persuasive say, well the doctor have seen when he open, when he opened your skull, seen everywhere. So, all we need to do right now I guess, is face, kind of like to face the music.

**Wilson:** It may have been too much for Wei Wu to handle. A few days later Gao found Wu's abandoned car near the 183 overpass at Mopac. Then discovered Wu had jumped off the overpass taking his own life. But when his body was sent to the Travis County Medical Examiner's office, analyzing Wu's brains, examiners noted no residual metastatic melanoma. Meaning Wei Wu did not have brain cancer. Both the Jetton and the Wu cases happened in 1999. Two other patients also filed suit against the doctor. The [Texas Medical Board] investigated Dr. Neely. The Board found Neely had a history of hand tremors and that between 1999 and 2002, Dr. Neely was writing prescriptions, not only for his patients but for himself as well. Narcotics, muscle relaxers and pain killers. Something former patient Paul Jetton finds shocking.

**Paul Jetton:** Narcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people. I mean it's just, even now I'm just, it's just incredulous, you just can't even believe that it even happened.

**Wilson:** The [Texas Medical Board] did discipline Dr. Neely. This past December, they suspended his license but gave it right back by staying the suspension. Now he's on probation for three years. The only requirements are that he see a psychiatrist and not write prescriptions for himself or his family. A decision the Board defends.

**Jill Wiggins [caption identifies her as a Board representative]:** We have compliance officers and the compliance officers will definitely follow to make sure that he's doing the things that his order requires him to do.

**Wilson:** But how would they know if he is using?  He can get somebody else to prescribe him.  I mean he could say, "I've followed the order."

**Wiggins:** Right.

**Wilson:** I didn't prescribe myself.

**Wiggins:** Right, right.

**Wilson:** How do we, how do we know that he's, that we're not putting somebody right back out there to do the same thing he was doing before?

**Wiggins:** That's a very good question and why this order doesn't include drug testing, I, I honestly don't know the answer to that.

**Paul Jetton:** I think it's just deplorable, I mean if, if it was another profession, uh, the guy would be in jail.

**Wilson:** We contacted Dr. Neely for his side to the story.  He declined to participate, but his attorney told us that two highly qualified neurosurgeons who reviewed the case agree with the medical decisions made by Dr. Neely.  In addition, the [Texas Medical Board] investigated the Jetton case and found no wrong doing.  We also contacted St. David's Medical Center, its chief medical officer believes they have a strong peer review process.  That's where individual doctors review each other's work and decide who should have privileges.

**Steve Berkowitz, M.D.:** In this particular case the investigation is incomplete and when we actually find the, get the findings we will then be able to make a determination uh, as to whether the privileges should be continued or not. We strongly value quality of course, we value the due process and most importantly we value patient safety.

**Wilson:** Nanci Wilson, KEYE News investigates.

[The camera then returns to the anchors, Cantu and Maggio.]

**Maggio:** The Jettons settled their suit against Dr. Neely. The suit filed on behalf of Wu's son was dismissed because it was not filed by an attorney. The other suits are pending.

**Cantu:** The Texas Board of Medical Examiners does post final actions taken against doctors on its web site, but all other information about complaints is kept secret.