# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00854-CV

### Francis Campone and Sai Temple of Spiritual Healing, Inc., Appellants

### v.

### Steven Kline and Fay Kline a/k/a Phaedra Kline, Appellees

#### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
#### NO. D-1-GN-15-004361, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Francis Campone and Sai Temple of Spiritual Healing, Inc. sued appellees Steven and Fay Kline for defamation.[1]  The Klines filed a motion to dismiss pursuant to the Texas Citizens Participation Act ("TCPA").  *See generally* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011. Following a hearing, the trial court signed an order granting the motion and ordering appellants to pay the Klines $10,000 in trial-level attorney's fees, as well as approximately $3,000 in costs and expenses and additional attorney's fees in the event of an unsuccessful appeal.  Appellants argue that Steven's motion to dismiss was untimely, that the TCPA does not apply to their claims, that they presented prima facie evidence of each element of their claims, that the Klines did not prove each element of their affirmative defenses, and that the trial court erred in awarding the Klines attorney's

---

[1]  Because some of the parties and witnesses share surnames, we will refer to those individuals by their first names when necessary for clarity.

fees. As explained below, we will reverse the trial court's order dismissing appellants' defamation claim against Steven related to statements he allegedly made to Charlotte Michelson and awarding attorney's fees. We will otherwise affirm the trial court's order of dismissal.

**Standard of Review and Applicable Law**

The TCPA is intended to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.* § 27.002; *see ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (per curiam). The TCPA must be "construed liberally" to fully effectuate its intent and provides for the expedited dismissal of claims brought "to intimidate or to silence" a defendant's exercise of his First Amendment rights. *Coleman*, 512 S.W.3d at 898 (quoting Tex. Civ. Prac. & Rem. Code § 27.011(b)). Thus, a motion to dismiss under the TCPA must be filed within sixty days after a defendant is served with a "legal action" "based on, relating to, or in response to a party's exercise of the right of free speech, right to petition, or right of association." Tex. Civ. Prac. & Rem. Code § 27.003(a), (b). A trial court "may extend the time to file a motion [to dismiss] on a showing of good cause." *Id*. § 27.003(b).

The trial court must dismiss the legal action if the movant shows by a preponderance of the evidence that the claim against him is based on, relates to, or is in response to his exercise of those rights. *Id.* § 27.005(b); *see Coleman*, 512 S.W.3d at 898; *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). The "exercise of the right of free speech" is defined as "a communication made in connection with a matter of public concern," Tex. Civ. Prac. & Rem. Code

2

§ 27.001(3); a "communication" is defined to "include[] the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic," *id.* § 27.001(1); and a "matter of public concern" is defined to "include[] an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace," *id*. § 27.001(7). The "exercise of the right of association" is defined as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *Id.* § 27.001(2). If the defendant shows that the TCPA applies, the burden shifts to the plaintiff to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). If the nonmovant makes such a showing, the trial court will still dismiss the action if the movant "establishes by a preponderance of the evidence each essential element of a valid defense" to the nonmovant's claim. *Id*. § 27.005(d).

We begin by asking whether the defendant showed that the plaintiff's claims were based on, related to, or in response to the movant's exercise of its right to free speech, without regard to the truth of the alleged statements. *In re Lipsky*, 411 S.W.3d 530, 543 (Tex. App.—Fort Worth 2013, orig. proceeding); *Kinney v. BCG Att'y Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at \*5 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.). Questions related to whether the alleged statements were defamatory, including an inquiry into their truth, are reserved for the second part of our review, when we ask whether the plaintiff presented a prima facie case as to his claims. *See Lipsky*, 411 S.W.3d at 543; *Kinney*, 2014 WL 1432012, at \*5. We apply a de novo standard to

3

both steps. *See Sloat v. Rathbun*, 513 S.W.3d 500, 503 (Tex. App.—Austin 2015, pet. dism'd); *Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.).

### Factual Summary

Francis is a spiritualist minister and healer. He founded and led the Temple, and his wife, Rupal Campone, was the treasurer. Membership in the Temple community was open to anyone, and members were not required to pay dues, to make donations, or to pay for healing sessions, although Francis periodically sent emails to his followers soliciting donations in exchange for "intensives," also called intensive healing sessions, and other healing sessions. The Klines became followers and attended healing sessions starting in 2008. Steven became very involved as a volunteer and eventually donated $25,000 to help Francis purchase some land intended to be used as a farm and for meetings and healing sessions.

Fay testified in her deposition that she began doubting Francis's healing abilities and eventually expressed her doubts to Steven in early 2013. Despite Fay's misgivings, Steven continued to have confidence in Francis "well into 2013." However, in December 2013, Karen Robison, a therapist who is a close friend of the Klines, told them "that three women had confided to her that Francis had behaving inappropriately with them." Karen said that the women had spoken to her independent of one another and "that Francis had either spoken to them inappropriately or possibly had an affair with one or more of these women." In his deposition, Steven testified similarly, saying that Karen Robison told him that several women had told her "that Francis made inappropriate comments to some women that made them so uncomfortable that they discontinued going to see them" or "had made comments implying they had had a sexual relationship with him." He did not

4

have any direct or personal knowledge of the truth of the rumors, and he said he did not know the names of any of the women involved.

Steven testified that shortly after hearing those reports from Karen, he discussed the rumors with about nine or ten people, including Fay, making it "very clear" that it was hearsay when he shared the allegations.[2]  The people he told were all current or former members of the Temple community who were also having misgivings about Francis, his abilities, and his behavior; some of them had recently terminated their association with appellants, most of the others terminated their association shortly after discussing their misgivings with Steven.  Fay admitted that the rumors "came up in the conversation" with other people involved with the community, but she could not remember who she had told.  She said that she was with Steven during those conversations and that they said that a "very reliable source revealed to Steve and me that Francis had been inappropriate in some regard with three women," always explaining "that this was secondhand information."  On December 18, 2013, Steven severed his connections with appellants via email.

In early 2014, Francis decided to sell the farm, and on February 4, 2014, Steven emailed him about that sale, asking whether Francis planned to "reimburse those of us who put money in specifically for the land purchase and/or improvements" and saying that Steven "strongly believe[d] the moral and ethical thing for you to do is to reimburse" those individuals.  On

---

[2] Steven said another woman told him that she was having a sexual relationship with Francis, but he did not believe her and "put no credibility in her comments."  He said he discussed her comments with two other members of the community, and those people "both concurred, yeah, don't believe this—don't believe this person.  A very mentally confused individual."

February 18, 2014, Rupal sent Steven a letter regarding "False and defamatory statements made by you to others regarding Reverend Francis Campone." Rupal said:

> It has come to the Board's attention that false statements were made by you to others regarding Reverend Francis Campone of Sai Temple of Spiritual Healing, Incorporated (SAI TEMPLE).
>
> You are hereby warned and notified to CEASE AND DESIST making false and defamatory statements regarding Reverend Francis Campone.
>
> The statements made by you regarding Reverend Campone are false and defamatory. If you fail to discontinue this defamation, we will have to take legal action.

She also asked Steven to stop using the Temple's email and contact list and to return the Temple's keys and credit card. Steven responded by email on March 1, 2014, stating, "The statement that I made false and defamatory statements against Francis is incorrect. Apparently the content of discussions I had with a very few people was not precisely, accurately and completely communicated." He stated that he would return the keys and credit card and that he would not use the Temple's email list in the future. However, he said, "Obviously I have established personal relationships with some of these people and will continue to communicate with them as I see fit."

Francis and his wife moved out of state in October 2014, but he traveled back to Texas to conduct healing sessions "as often as I was able." In February 2015, he returned to Texas for a healing session with Charlotte Michelson, at which time, he testified, Michelson told him:

> she had stopped coming to the Sai Temple and stopped asking me for healing because she had been told by Steven Kline in April of 2014 that I was having an affair with at least one married woman who attended the Sai Temple and that my wife was a devil worshiper. She said that she was afraid to come to the Sai Temple

or to my healing sessions anymore because of these statements by Mr. Kline. I had never heard of these statements by Mr. Kline to Ms. Michelson before.

Michelson testified in her deposition that in late April 2014, she ran into Steven, who told her:

that Francis was a fake, he never healed anyone. He said that he had given Francis a lot of money and he wanted it back. He said that Francis . . . had an affair with Teresa who lived up at the farm in a trailer with her husband. He said that Rupal, Francis's wife, was a devil worshiper and she—and if I went to Francis, he would drain all the energy away from me and somehow give it to Rupal or something.

Michelson was shocked by Steven's allegations, and she called two other people associated with the Temple. One of them "basically told me the same things," and the other "said he didn't know anything, all he knew was that nobody believed in Francis anymore." A third person who had been associated with the group called Michelson and "said the same things that Steve Kline had told me and that she believed the stuff, and [Michelson] was shocked again, shocked because she was one of Francis's real big fans." Michelson said she did not see Francis for healing between April and October 2014 because "I was afraid to go back after what Mr. Kline told me."

Francis sued Steven for defamation on September 30, 2015. The Temple was added as a plaintiff in March 2016, and appellants added Fay as a defendant in August 2016. Appellants alleged that Steven had defamed Francis in his conversation with Michelson and that Fay made defamatory statements about Francis to Theresa Chai "and probably others." Appellants alleged that the statements were defamatory per se and had caused the Temple to lose followers, volunteers, and donations. The Klines filed a motion to dismiss under the TCPA on September 23, 2016, which the

trial court granted on November 22, awarding the Klines $10,000 in attorney's fees, costs and expenses amounting to slightly more than $3,000, and conditional appellate attorney's fees.

Appellants complain that Steven's motion was untimely under the TCPA and that he did not show good cause for extending the deadline to file; that the TCPA does not apply to appellants' claim against the Klines; that appellants put forth prima facie evidence for each element of their claim; that the Klines did not establish their affirmative defenses; and that the court erred in its award of attorney's fees. We will consider the timeliness of Steven's motion first.

**Timeliness of Steven's Motion to Dismiss**

On September 30, 2015, Francis filed an original petition naming Steven as the sole defendant and asserting a claim for defamation.[3] The full allegations related to the facts and asserted cause of action read as follows:

> Kline made a series of defamatory statements concerning Campone, a private Plaintiff. Campone wrote to Kline asking him to stop making such statements. Nevertheless, Kline continued making defamatory statements about Campone. Specifically, Kline ran into Charlotte Michelson at a Sprint store in the Austin area in January 2015. Kline asked Michelson to step outside so he could tell her what was going on. He then proceeded to make defamatory statements about Campone that were false.

> The statements complained of purported to be statements of fact. The statements were unambiguous. With regard to the falsity of the statements, Kline was either acting with actual malice, was negligent, or is liable without regard to fault.

Steven was served with the original petition on October 2015 and filed an answer in November 2015.

_____

[3] The original petition named only Francis as a plaintiff, but in March 2016, he filed an amended petition, adding the Temple as a plaintiff and making the same allegations of fact.

8

On August 9, 2016, appellants filed a second amended petition, adding Fay as a defendant. The full recitation of "Facts and Cause of Action" reads as follows:

Steven Kline made a series of defamatory statements concerning Campone, a private Plaintiff. Campone wrote to Steven Kline asking him to stop making such statements. Nevertheless, Steven Kline continued making defamatory statements about Campone. Specifically, Steven Kline ran into Charlotte Michelson at a Sprint store in the Austin area in January 2015. Steven Kline asked Michelson to step outside so he could tell her what was going on. He then proceeded to make defamatory statements about Campone that were false. Steven Kline also made defamatory statements to others concerning Campone, as more particularly described in his deposition.

Phaedra Kline made defamatory statements to Theresa Chai and probably others. Those statements are described in Ms. Chai's deposition.

The statements complained of purported to be statements of fact. The statements were unambiguous. With regard to the falsity of the statements, Steven Kline and Phaedra Kline were either acting with actual malice, were negligent, or are liable without regard to fault.

The statements were defamatory per se. Therefore, damages are presumed.

Plaintiff Sai Temple has been harmed by the defamatory statements made by Steven Kline and Phaedra Kline about its leader, Plaintiff Campone.

On September 23, 2016, the Klines filed a joint motion to dismiss. The Klines acknowledged that the motion was filed more than sixty days after Steven was served with the original petition and asked the trial court to grant an extension of time, asserting:

the only allegation contained in Plaintiff's Original Petition was allegedly made in January 2015, but has now been shown by the witness's own testimony to have been made in April 2014, if made at all. As such, that claim would have been barred by the one-year statute of limitations. It was not until the filing of Plaintiffs' Second Amended Original Petition that additional claims were made against Mr. Kline. As set forth above, this Motion is brought within 60 days of the service of Plaintiffs'

9

Second Amended Original Petition and these additional claims. Considering that Plaintiff's [sic] original allegation was, and still is, falsely dated to avoid limitations, that the new claims against Mr. Kline were added less than 60 days ago, that these new claims still fail to contain any specificity, and that Mrs. Kline has just been added to the lawsuit and has timely filed this Motion, good cause exists to extend Mr. Kline's time to file this Motion. Accordingly, Mr. Kline respectfully requests the Court grant him an extension and accept this Motion as timely.

The motion went on to state that the alleged statements by Steven were made in connection with a matter of public concern and to assert limitations, truth, and qualified privilege as defenses.

Appellants filed a third amended petition on October 11, 2016, adding allegations explaining how Campone learned of the Klines' remarks in February 2015 and in August 2016 and asserting that the discovery rule should apply to toll the running of limitations. They also provided more detail about the allegedly defamatory statements made by Fay. Appellants responded to the Klines' motion, filing an amended response the day before the hearing. In the amended response, appellants argued that the second amended petition did not assert any new claims against Steven and thus did not restart the sixty-day period. They contended that dismissal after the suit had been pending for a year would not serve the intent of the TCPA—to provide for dismissal early in the litigation—noting discovery had gotten well underway. Appellants also asserted that Steven had not shown good cause for an extension of the TCPA deadline. As for Steven's assertion that he recently learned that he could assert limitations as a defense, appellants argued that Steven had at the same time learned that the discovery rule would toll limitations and, therefore, that he should not be granted additional time on that basis, stating, "A limitations defense that is defeated by application of the discovery rule does not provide good cause [for] missing the 60-day deadline."

10

At the hearing, the parties touched on the timeliness of Steven's motion, but most of the discussion and argument was related to the timeliness of additional affidavits filed by the Klines a week before the hearing, appellants' objections to those affidavits, and the time frame in which the trial court was required to rule on the motion to dismiss. At the conclusion of the hearing, the trial court stated that it was taking the matter under advisement. About two weeks after the hearing, the trial court signed its order granting the Klines' motion to dismiss. It did not make findings, rulings, or other statements related to Steven's request for additional time to file his motion. *See* Tex. Civ. Prac. & Rem. Code § 27.003(b) (trial court may extend time for filing TCPA motion).

In their first issue, appellants contend that the motion to dismiss, filed on September 23, 2016, was untimely as to Steven. However, in their second and third amended petitions, appellants added new factual allegations about instances of alleged defamation, aside from his statements to Charlotte Michelson. The deadline for filing a TCPA motion may be reset if an amended petition asserts claims "based upon new factual allegations," *see Jordan v. Hall*, 510 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2016, no pet.). The second, and then third, amended petitions alleged new and distinct injuries, including adding Fay as a defendant, and thus the motion was timely as to all of appellants' defamation claims other than those grounded in the alleged statements made to Michelson. *See Stephan v. Baylor Med. Ctr.*, 20 S.W.3d 880, 888 (Tex. App.—Dallas 2000, pet. denied) (each republication of defamatory statement generally inflicts "new and distinct injury" and thus can be basis of new and separate claim).

As for the appellants' allegations related to Steven's statements to Michelson—specifically, the new assertion that the conversation between Steven and Michelson

11

occurred in 2014, not 2015— we conclude that changing the date does not amount to asserting a new claim. Appellants merely clarified the date of the alleged conversation, but all of the other relevant details, including the very specific allegations of where and how the conversation took place, remained essentially the same. Steven claims that the conversation never took place at all; he does not argue that he was somehow misled or confused because he had not spoken to Michelson in 2015 but had in 2014. We therefore conclude that Steven's motion was untimely as to appellants' defamation claim related to the Michelson conversation.

Steven also asserts that he showed good cause for extending the time to file his motion as to the Michelson allegations. The granting of an extension of time under section 27.003(b) is left to the trial court's discretion. *See Morin v. Law Office of Kleinhans Gruber, PLLC*, No. 03-15-00174-CV, 2015 WL 4999045, at *3 (Tex. App.—Austin Aug. 21, 2015, no pet.) (mem. op.). However, the trial court did not make statements related to Steven's request for an extension of time for good cause and the Klines did not obtain any explicit ruling on that request. *See In re Estate of Check*, 438 S.W.3d 829, 836 (Tex. App.—San Antonio 2014, no pet.). Even if we assume that by granting the TCPA motion, the trial court impliedly granted Steven's request, *see Schimmel v. McGregor*, 438 S.W.3d 847, 855 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (trial court's statement that TCPA motion was timely filed "impliedly ruled that there was good cause for defendant's failure to file his motion on time as required under the TCPA"), we cannot hold that Steven showed good cause as to why he did not seek dismissal under the TCPA when he was originally sued.

As noted above, appellants' allegations about the circumstances surrounding the conversation remained unchanged other than their clarifying that the conversation occurred in 2014, not 2015. Steven denied that he had ever had such a conversation with Michelson as alleged in either petition. There was no explanation of why Steven could not have sought dismissal within sixty days of originally being sued. Under these particular facts, we agree with appellants that Steven did not show good cause for extending the TCPA deadline—from sixty days to one full year—as to the defamation claim grounded on the Michelson conversation. *See Jordan*, 510 S.W.3d at 198-99 (TCPA deadline is not reset when amended petition does not add new claims or factual allegations); *Morin*, 2015 WL 4999045, at *3 ("In assessing 'good cause' in other contexts, the supreme court held that '[g]ood cause is established by showing that the failure involved was an accident or mistake, not intentional or the result of conscious indifference.'" (quoting *Wheeler v. Green*, 157 S.W.3d 439, 442 (Tex. 2005))); *Check*, 438 S.W.3d at 836-37 (reiterating TCPA's purpose of expedited dismissal of unmeritorious suits related to exercise of free speech). We overrule their first issue as to appellants' claims against Fay and their claims against Steven not arising out of the alleged conversation with Michelson. We sustain appellants' first issue as it relates to their claim for defamation grounded in the Michelson conversation. Thus, the following analysis only concerns appellants' claims that do not relate to the Michelson conversation.

**Does the TCPA Apply?**

In their second issue, appellants urge first that the TCPA does not apply to their defamation claims; second, that they presented prima facie evidence of each element of their claims; and third, that the Klines did not establish each element of their affirmative defenses. We begin by

13

asking whether the Klines showed that appellants' claims were based on, related to, or were in response to the Klines' exercise of their right to free speech, without regard to whether appellants' allegations are true. *See Lipsky*, 411 S.W.3d at 543; *Kinney*, 2014 WL 1432012, at *5.

Appellants first argue that because the Klines denied the allegations, they cannot seek dismissal under the TCPA. However, the supreme court has held that whether the TCPA applies is evaluated based on the claims made in the plaintiff's pleadings and is not affected by a defendant's denial of those allegations. *Hersh v. Tatum*, 526 S.W.3d 462, 466-67 (Tex. 2017).

Further, the fact that the Klines were ending their affiliation with appellants at approximately the same time they allegedly made their statements does not mean, as argued by appellants, that the statements cannot be considered related to or based on the Klines' exercise of their right of association. The Klines were members of the spiritual community for a number of years, as were the people with whom they allegedly shared their statement, and the statements involved discussing the behavior of the leader of the community. The Klines showed that appellants' claim was based on their exercise of the right of association. *See* Tex. Civ. Prac. & Rem. Code § 27.001(2) (defining "right of association" as communication between individuals "who join together to collectively express, promote, pursue, or defend common interests"); *see, e.g.*, *Fawcett v. Rogers*, 492 S.W.3d 18, 23-24 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (parties to lawsuit were all members of same Masonic lodge); *Combined Law Enf't Ass'ns of Tex. v. Sheffield*, No. 03-13-00105-CV, 2014 WL 411672, at *5 (Tex. App.—Austin Jan. 31, 2014, pet. denied) (mem. op.) (defamation claim based on allegations of misconduct during and immediately following plaintiff's employment with association of members who sought "to collectively express, promote,

14

or defend the common interests of police officers"; claim related to members' exercise of right of association).

Appellants also contend that the Klines did not show that the alleged statements were exercises of their right of free speech because the statements were not about matters of public concern. However, courts have noted the expansive scope of the TCPA, with the supreme court stating that "[t]he TCPA casts a wide net" and that "[a]lmost every imaginable form of communication, in any medium, is covered." *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018); *see Cavin v. Abbott*, 545 S.W.3d 47, 60-65 (Tex. App.—Austin 2017, no pet.) (discussing cases showing breadth of TCPA); *see also Craig v. Tejas Promotions, LLC*, __ S.W.3d __, No. 03-16-00611-CV, 2018 WL 2050213, at *5 (Tex. App.—Austin May 3, 2018, no pet. h.) (noting TCPA's "broad terms"). The TCPA has been held to apply to defamation cases arising out of: an email and a blog post alleging that a developer had not paid creditors, commingled funds, engaged in contract fraud, and failed to disclose a felony conviction, *Adams*, 547 S.W.3d at 894-96; allegations that an employee had not properly gauged a storage tank, *Coleman*, 512 S.W.3d at 897-98; allegations that a certified registered nurse anesthetist held himself out as a doctor, endangered patients, and sexually harassed employees, *Lippencott v. Whisenhunt*, 462 S.W.3d 507, 508-09 (Tex. 2015) (per curiam); allegations of mental illness and spousal abuse, *Cavin*, 545 S.W.3d at 53, 63-64; allegations that a parent was abusive toward a little league umpire, *Bilbrey v. Williams*, No. 02-13-00332-CV, 2015 WL 1120921, at *8-9 (Tex. App.—Fort Worth Mar. 12, 2015, no pet.) (mem. op.); and a former employee's online review of his former employer, *Kinney*, 2014 WL 1432012, at *1, 5. Appellants alleged that the Klines had said that Francis was

15

conducting himself improperly in his role as a religious leader, had made multiple women feel uncomfortable, was taking financial advantage of members of the spiritual community, and was falsely holding himself out as a healer when he had no such abilities. Those allegations can be viewed as touching on issues of public health (whether Francis was improperly claiming he could heal physical ailments) and public safety (whether he made women feel unsafe), economic well-being (whether he was improperly retaining donated funds), community well-being (whether the Temple and Francis as its leader were behaving properly), and potentially even a service in the marketplace (the validity of Francis's claims of being able to heal ailments). *See* Tex. Civ. Prac. & Rem. Code § 27.001(7). The trial court would not have erred in concluding that the Klines' alleged statements about Francis's behavior were made in connection with matters of public concern.

We overrule appellants' argument that the TCPA does not apply to their claims.

## Was Dismissal Proper Under the TCPA?

Because the TCPA applies, we now consider the other issues raised by appellants. As we will explain below, Steven established the affirmative defense of limitations, and both he and Fay established the defense of qualified privilege. Therefore, assuming without deciding that appellants carried their burden of establishing by clear and specific evidence a prima facie case for each essential element of their defamation claims, we will affirm the trial court's order of dismissal. *See id.* § 27.005(d) (court shall dismiss legal action if movant establishes each essential element of valid defense by preponderance of evidence).

In their answer, the Klines asserted that appellants' claims against them were barred by limitations, and in their TCPA motion, they asserted specifically that the claims against Steven

16

were barred by limitations. Appellants do not contest that Steven's alleged defamatory statements were made more than a year before they filed suit. *See id.* § 16.002(a) (one-year limitations period for defamation suit); *Deaver v. Desai*, 483 S.W.3d 668, 674 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("For defamation claims, there is a one-year statute of limitations, which begins to run from the day the cause of action accrues."). Instead, they assert that the running of limitations was tolled under the discovery rule.

The discovery rule applies to a defamation claim when the defamatory statement is "inherently undiscoverable or not a matter of public knowledge." *Velocity Databank, Inc. v. Shell Offshore, Inc.*, 456 S.W.3d 605, 609 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Deaver*, 483 S.W.3d at 674-75. "To be 'inherently undiscoverable,' an injury need not be impossible to discover, but it must be, by nature, unlikely to be discovered within the prescribed limitations period despite due diligence." *Velocity Databank*, 456 S.W.3d at 609 (citing *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex. 1996)). If the discovery rule is deemed to apply, limitations begin to run when the plaintiff learns or should have learned of the defamatory statement. *Id*. (citing *Childs v. Haussecker*, 974 S.W.2d 31, 37 (Tex. 1998)). "The discovery rule is a limited exception to strict compliance with the statute of limitations." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 457 (Tex. 1996); *see Velocity Databank*, 456 S.W.3d at 609 ("The statute of limitations is applied strictly and the discovery rule is a very limited exception."). "The inherently undiscoverable requirement is strictly construed." *Roberts v. Davis*, No. 06-07-00024-CV, 2007 WL 3194813, at *2 (Tex. App.—Texarkana Nov. 1, 2007, pet. denied) (mem. op.).

17

The Klines both admitted to passing along Robison's hearsay allegations to several people in late 2013. Rupal wrote Steven a cease-and-desist letter in early February 2014, instructing him to stop defaming Francis and threatening to take legal action if he persisted. Steven testified in his deposition that Rupal's cease-and-desist letter referred to his discussing the rumors with other members or former members of the community. He also testified that he was referring to those rumors in his December 2013 email terminating his association with appellants, in which he said, "I have seen and heard instances of less than unconditionally loving and truthful words and actions. I have heard other instances of this from others, including descriptions of sexual indiscretions. This is hearsay, but I trust the sources of the most serious matters." Chai testified in her deposition, taken August 8, 2016, that Fay told her Francis had had "inappropriate relationships with some of the people he was healing." Chai did not remember when Fay told her about the rumors but testified that it was not within the last year; appellants immediately added Fay as a defendant.

For his part, Francis's affidavit set out a chronology of the Temple and the Klines' involvement with it, including Steven's February 2014 letter asking to be reimbursed for his donation. In the paragraph immediately following, Francis averred:

> I began to hear that Steven Kline was telling people that I had been having affairs with women who had attended the Sai Temple. Such statements were false and Steven Kline could have confirmed that they were false by asking the women he claimed were involved. I also became aware that persons who had been involved in the Temple's work and in healing sessions were disappearing.
>
> On February 18, 2014, my wife, who was Treasurer of the Sai Temple, sent a "cease and desist" letter, return receipt requested, to Steven Kline demanding that he stop making false statements about me, that he stop using the Sai Temple email list, and that he return keys to the Temple property and a Sai Temple credit card that he still had. A copy of that February 18, 2014, letter is attached as Exhibit D to this

18

Affidavit. My wife and I did not take any further action regarding the reports that we had heard.

As stated earlier, the discovery rule only operates to toll limitations when the defamation is "inherently undiscoverable or not a matter of public knowledge." *Velocity Databank*, 456 S.W.3d at 609. The injury need not be *impossible* to discover, but by nature it must be unlikely to be discovered within the limitations period despite the plaintiff's due diligence. *Id*. Further, if the discovery rule does apply, limitations will begin to run when the plaintiff learns *or should have learned* of the defamation. *Id*. We will strictly construe the discovery rule and its "inherently undiscoverable" requirement. *See Altai*, 918 S.W.2d at 457; *Velocity Databank*, 456 S.W.3d at 609; *Roberts*, 2007 WL 3194813, at *2.

"Once a claimant learns of a wrongful injury, the statute of limitations begins to run even if the claimant does not yet know the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it." *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 207 (Tex. 2011) (cleaned up). "After being put on notice of the alleged harm or injury-causing actions, the claimant must exercise reasonable diligence to investigate the suspected harm and file suit, if at all, within the limitations period." *Id*.

The evidence presented by the parties, including Francis's own affidavit, establishes that Francis knew that Steven had made statements about alleged sexual misconduct on Francis's part before Rupal sent Steven the cease-and-desist letter on February 18, 2014. Francis specifically averred that he and Rupal "did not take any further action" regarding that knowledge. He did not file suit until late September 2015, seven months after he learned of Steven's alleged conversation

19

with Michelson and more than eighteen months after he learned of Steven's alleged defamation in the Temple community. The fact that Francis learned in early 2015 that Steven had also defamed him to Michelson does not mean that limitations was tolled until that discovery. Instead, limitations began to run sometime between December 2013 and February 18, 2014, which was the latest date on which appellants knew or suspected that Steven was defaming them to some degree. Because Campone's affidavit establishes that appellants had actual notice of the potential harm as of that date, appellants had one year to investigate the extent of the defamation and file suit. They failed to do so and therefore cannot rely on the discovery rule to toll the running of limitations. *See id.* Therefore, Steven showed by a preponderance of the evidence that appellants' claims against him (other than the claim related to Michelson) are time-barred.

Further, the Klines both contended that they had established the defense of qualified privilege because their statements were made without malice, concerned Francis's actions as leader of the Temple community, and were communicated only to other members of the community.

A "qualified privilege exists under the common law when a statement is made in good faith and the author, recipient, a third person, or one of their family members has an interest that is sufficiently affected by the statement." *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013). Such a privilege "remains intact as long as communications pass only to persons having an interest or duty in the matter to which the communications relate." *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). The privilege does not apply "if the person claiming it does not act for the purpose of protecting the common interest." *Grant v. Stop-N-Go Mkt. of Tex., Inc.*, 994 S.W.2d 867, 874 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

20

A qualified privilege justifies a communication made without actual malice, *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 899 (Tex. 1970), which is not presumed, *Dixon v. Southwestern Bell Tel. Co.*, 607 S.W.2d 240, 242 (Tex. 1980). Instead, the party seeking to defeat the assertion of a qualified privilege must prove that the speaker knew the statement was false or acted with reckless disregard for its truth. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171 (Tex. 2003). "Reckless disregard is a subjective standard, focusing on the defendant's state of mind," and mere negligence does not satisfy that standard. *Id.* Instead, "there must be sufficient evidence to find that the speaker entertained 'serious doubts' as to the truth of his statements." *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 572 (Tex. App.—Dallas 1989, no writ) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Malice "cannot be inferred from the character of the allegedly defamatory statement without other evidence to prove it." *Id.* at 572-73 (citing *Fitzjarrald v. Panhandle Publ'g Co.*, 228 S.W.2d 499, 505 (Tex. 1950)).

Appellants argue that the Klines cannot invoke qualified privilege because they had already left the Temple community. However, the Temple does not have any particular membership requirements. Further, the record reflects that the Klines passed Robison's allegations along to other members who had been having doubts about appellants, some of whom had already decided to leave and others who decided to leave soon after the Klines did. They passed along the allegations at the time they themselves were leaving or had just left the Temple. The fact that the Klines and those other individuals were leaving or wavering about their allegiance to appellants does not mean that they cannot be considered to have a common interest in Francis's behavior toward members of the community. *See Honeycutt v. Forest Cove Prop. Owners' Ass'n*, No. 14-98-01255-CV,

21

2001 WL 520959, at \*4-6 (Tex. App.—Houston [14th Dist.] May 17, 2001, no pet.) (mem. op.) (group of neighbors wrote letter to homeowners' association, copying school board, asking for action to curb parties thrown by Honeycutt, which they alleged resulted in fighting, profanity, public lewdness, and driving while intoxicated; defendants were entitled to claim qualified privilege because defendants did not entertain serious doubts as to truth of statements and school board "had an interest in the information as it related to the safety and health of their students"); *Weisberg v. London*, No. 13-02-00659-CV, 2004 WL 1932748, at \*8 (Tex. App.—Corpus Christi Aug. 31, 2004, no pet.) (mem. op.) (statements by one temple to another about whether plaintiffs were in good standing were protected by qualified interest because new temple "had an interest in the information"); *Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d. 85, 92-93 (Tex. App.—Dallas 1996, writ denied) (church's allegations of misappropriation were protected by qualified immunity because members had common interest in use of donations); *cf. Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 648-49 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (because there was "no proof that these statements were necessary to protect the interest of Hettig or anyone else in the neighborhood," court properly denied instruction on qualified privilege).

The record does not establish that the Klines and the recipients of their communications cannot be considered at the time to have a common interest. Instead, the Klines established that they, the people to whom they spoke, a third person, or one of their family members had an interest that was sufficiently affected by the statement.[4] *See Neely*, 418 S.W.3d at 62. Thus,

---

[4] Appellants assert that at the time Fay spoke to Chai, Chai was no longer a member of the Temple community and had moved to a different state. However, they have not pointed to evidence showing that. Instead, Fay indicated that she spoke of the rumors in late 2013, and an exhibit

22

unless appellants presented evidence raising a fact issue as to whether the Klines acted with actual malice, the record supports a conclusion that the Klines were protected by qualified immunity.

In his deposition, Steven testified that before hearing the allegations from Robison, he had begun talking to other members of the Temple who "already had a lot of misgivings about Francis that had built up over time like me." He said that hearing the allegations from Robison, "a source that I trusted," "was a precipitating event for me. You know, it's—that I sat there and considered it for a couple of days and said, This is worse than I thought it was. I must get away from this immediately." Asked why he passed Robison's allegations along to other members of the Temple community, Steven said:

> I said, you know, it's hearsay, but you—you need to know this because I trust the source. I didn't feel there was any way she would make up—make this stuff up. . . . And I knew those that were still going to see Francis already had a lot of misgivings. . . . I—and it's partly out of coming to a realization that things were worse than I—I knew there were a lot of things wrong, but it was coming to a realization that, Oh, my gosh, it's—I think it's worse than what I thought it was.

In her deposition, Fay said:

> Any statement that I have made about Francis or Sai Temple have been truthful. I never intended to hurt Francis or Sai Temple, but I did feel an obligation to let people know about my experiences with Francis and the Sai Temple community. Karen Robison is a good friend of mine. She told me she had encountered several women

consisting of minutes from a September 25, 2013 Temple board meeting states that "Theresa and Jon informed us that they were relocating to Iowa . . . within the next couple of weeks." It also noted Chai's "constant negativity" and "paranoid and constant criticism of everything we were doing." Minutes from a January 8, 2014 meeting indicate that Chai was still in contact with other members of the Temple community. The evidence thus indicates that Chai was still involved with members to some degree through the end of 2013 and possibly into early 2014.

23

who alleged that Francis Campone had acted inappropriately towards them. I consider Karen Robison a trustworthy and reliable person, so I had no reason not to believe her.

Former Temple member Elizabeth Chang testified in her deposition that shortly after the Klines left the Temple, Francis and his wife told her that Steven "was fooling around with Theresa." Chang said that when she heard those allegations, "I'm thinking, if you say you are representing holy spirit why you bad mouth people. And that is not true. I don't believe in that. . . . There's no way Steve would fool around with Theresa." Chang asked Chai about the Campones' allegations, and Chai denied them, saying that she had thought Francis was trustworthy but instead "his word and his action are totally reversed." Chang testified that the Klines never told her anything about bad behavior by Francis but that another person told her that Francis had behaved inappropriately toward her personally and toward a few other women. Chang initially did not believe those allegations because she believed Francis to be a good person but started to second-guess that after Francis badmouthed Steven and Theresa. She also said that Francis at one point told her, "I'll sue anybody who is not on my side." The Klines also presented affidavits by:

- Karen Robison, who averred that in her practice as a "licensed Religious Science practitioner," she had counseled three women who alleged that Francis "had acted inappropriately, in a sexual way, towards them"; that she shared general information about those allegations with Steven but did not disclose the names of the women; and that Theresa Chai was not one of the three women.

- Karen Robison's husband, who averred that he and his wife left the Temple in 2011, that their decision to leave was unrelated to anything Steven had said, that he knew Steven to be honest, that he did not believe Steven would lie, and that Steven never alleged that Francis had had an affair with Chai; and

24

- Nineteen people who initially believed in Francis's healing abilities but became disenchanted with him. Those people all averred that they had never heard either of the Klines make disparaging, defamatory, or untrue comments about appellants. Several stated that they believed Francis was a fraud or that they believed he took advantage of his followers.

Appellants note that the Klines testified that they heard similar rumors from other women but disregarded them because they believed those women to be unreliable sources and argue that their failure to ask Robison about the sources of her allegations or to investigate her allegations more deeply should be viewed as evidence of malice. However, on this record, we believe that evidence cuts against a finding of actual malice. The Klines put credence in Robison and her evaluation whereas they were unwilling to believe or disseminate similar rumors from other sources they believed were not credible. That supports a conclusion that the Klines did not subjectively doubt the reliability of Robison and her sources of information. The Klines presented evidence showing that they did not entertain serious doubts about the veracity of Robison's information.[5] Appellants have not presented evidence to the contrary. *See Forbes*, 124 S.W.3d at 171; *Gillum*, 778 S.W.2d at 572.

Because the Klines established the defenses of limitations as to the claims against Steven and qualified immunity as to the claims against both Steven and Fay, the trial court did not

---

[5] Appellants attempt to undermine the Klines' assertions that they believed Robison to be credible by noting that Robison claims to use "angel reading" in her practice as a spiritual therapist and characterizing Robison's allegations as "double hearsay inferences from a seance." However, both Robison and Francis claim to consult with angels in their profession, and the record does not support a conclusion that Robison gleaned her information from an angel or a "seance." Robison clearly explained that she was told by multiple women that Francis had behaved improperly toward them and that at least one other woman "implied" that she and Francis had a sexual relationship.

25

err in dismissing appellants' defamation claim, regardless of whether appellants presented a prima facie case as to each element of defamation. *See* Tex. Civ. Prac. & Rem. Code § 27.005(d).

### Attorney's Fees

In their third issue, appellants argue that the trial court's award of attorney's fees was improper because the Klines did not segregate the fees incurred by each of them. They further complain that the affidavit supporting the Klines' request for attorney's fees did not sufficiently show that the fees were segregated between this case and a separate case brought by Steven against appellants related to the sale of the farm. Finally, they complain that the affidavit said only that the fees were reasonable, not that they were necessary. Because we reverse the dismissal of appellants' claim against Steven related to the Michelson conversation, we reverse the trial court's award of attorney's fees and remand that issue for reconsideration in light of this opinion. *See id.* § 27.009 (attorney's fees award is mandatory when TCPA motion is granted).[6]

### Conclusion

Steven's motion to dismiss under the TCPA was not timely as to the claim against him arising from the Michelson conversation. However, as to the other claims, the motion was timely, the Klines established by a preponderance of the evidence the essential elements of two valid defenses, and appellants have not shown error in the trial court's dismissal under the TCPA. We

---

[6] Although the Klines ask in their appellee's brief to have the attorney's fee award modified to the full requested amount of $23,250, they did not file a notice of appeal and thus may not request from this Court more favorable relief than was granted by the trial court. *See* Tex. R. App. P. 25.1 (party who seeks to alter trial court's judgment must file notice of appeal, and appellate court generally may not grant more favorable relief than did trial court to party who does not file notice of appeal); *Lubbock Cty. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 584 (Tex. 2002).

therefore affirm the trial court's dismissal of the claims against Fay and the claims against Steven other than the one arising out of the Michelson conversation. *See id.* § 27.005(d). We reverse the dismissal of the claim grounded in the Michelson conversation and the trial court's award of attorney's fees and remand those issues for further proceedings consistent with this opinion.

_____

Cindy Olson Bourland, Justice

Before Chief Justice Rose, Justices Field and Bourland

Affirmed in Part; Reversed and Remanded in Part

Filed:   August 2, 2018