Greg Barnette and Mike Mosko, both former City of Montgomery police officers, filed a slander action against John Wilson, the chief of police for the City of Montgomery, in the United States District Court for the Middle District of Alabama. That federal court, acting pursuant to Rule 18, Ala.R.App.P., certified to this Court the following question:
 "Is a person who publishes a slander at a press conference responsible for damages caused by the expected and intended repetition of the slander by the news media?"
The federal district court set out the following facts in its certification to this Court: Barnette and Mosko were, during the period 1989-90, members of the "Return our Turf" team ("ROT"), a division of the Narcotics and Intelligence Bureau of the Montgomery Police Department. The captain of the ROT team during this period was Larry Armstead. Capt. Armstead began receiving anonymous telephone tips indicating that particular members of the team would stop suspects and, if they found drugs and money on the suspects, would take the money but not make an arrest. Mosko was one of two officers specifically referred to in the telephone tips by their nicknames. Mosko's nickname was "Old Dude." On one occasion when Capt. Armstead was out with the ROT team executing a search warrant, he spotted money and jewelry in the apartment being searched; later, after two ROT team officers, the plaintiff Greg Barnette and Officer Marty Wooten, had entered and exited the room, the jewelry was gone.
Based upon the telephone tips, his personal observation, and confidential conversations with other officers in the department, Capt. *Page 1166 
Armstead set up a "sting" operation that targeted six members of the ROT team. The sting was executed by using a police department trainee posing as a crack cocaine dealer. The police planted $2,300 and 9 grams of cocaine in an apartment. Two officers arrested the trainee outside the apartment, and Officers Barnette, Mosko, Wooten, and Bertarelli entered the apartment. After the officers left the apartment, both the money and the drugs were gone.
The four officers were detained and were questioned at police headquarters. Another officer was instructed not to let the officers out of his sight while they were detained. At some point, each of the four officers was allowed to visit the restroom unattended. Later, a body search of each of the four disclosed $560 on Bertarelli (approximately one-fourth of the total), but no money was found on the other three officers. A large portion of the money was found in the sewer line of the police station. Bertarelli stated that in the apartment Wooten had approached him, holding four envelopes, and that Wooten handed him one of the envelopes, which contained one-fourth of the money that had been in the apartment.
Early the next morning, the four officers were called back to the police station and were presented with three alternatives. An attorney retained by the Police Benevolent Association acted as an intermediary with the ROT team officers and the police department officials. The first two alternatives would have had Bertarelli and Wooten go to jail and would have had Mosko and Barnette become the subject of a messy public investigation that the police chief guaranteed would result in the firing of both officers. The third alternative was that if all four officers resigned immediately, the department would not press criminal charges and would not release to the press the names of the four.
All four men immediately tendered written resignations, although Barnette and Mosko maintained that they were innocent. Fifteen minutes later, Chief Wilson stated at a press conference: "I feel like we accomplished what we wanted to do. We found four dirty cops and four dirty cops are gone." At this same conference, Chief Wilson specifically named the four ROT team officers involved. As a result of the press conference, the local news media published related stories for several weeks.
Officers Mosko and Barnette filed a defamation action against Police Chief Wilson. A jury returned a verdict in favor of the plaintiffs on the slander claim. Wilson moved for a judgment as a matter of law. See Rule 50(a), F.R.Civ.P. He claimed that he was not liable for damage resulting when the news media repeated his statement. The federal district court determined that the case involved a question of law without "clear controlling precedent" and certified the question to this Court.
A jury has found that the original publication by Chief Wilson was slanderous. The federal district court has certified its question. Because the jury has already returned a verdict in this case and the federal court has asked a certified question of limited scope, this Court may not address the merits of the slander action against Chief Wilson. We must limit our discussion to answering the certified question.
"The general rule is that one who publishes a defamatory statement will not be held liable for the repetition of it by others. 53 C.J.S. Libel and Slander § 85. When, however, the second publication is a natural and probable consequence of the first, the initial publisher is responsible for it. Giordano v.Tullier, 139 So.2d 15 (La.App. 1962). 'Where there were circumstances, known to the original defamer at the time of his publication that might reasonably lead him to expect a repetition, he is responsible for it.' " Davis v. NationalBroadcasting Co., 320 F. Supp. 1070, 1072 (E.D.La. 1970). InDavis, the plaintiff sued NBC as the original publisher of a defamatory statement that was reprinted six weeks later in a newspaper.
In Muirhead v. Zucker, 726 F. Supp. 613 (W.D.Pa. 1989), the plaintiff alleged that a news release concerning a lawsuit was false and defamatory and had been motivated by malice. The defendants claimed that they *Page 1167 
had only provided information to the newspaper and argued that they could not be held responsible for the results that followed the newspaper's publication of that information. The court stated that this line of reasoning was "ludicrous."726 F. Supp. at 617.
An actor is presumed to intend the logical outcome of his actions. One who publishes a defamatory statement to news media will not be shielded from liability just because the harm to the person defamed has resulted from the republication by the news media. Once a person makes a defamatory publication, the person defamed has a cause of action.
Normally, the original publisher of a defamation is not responsible for the consequences of its repetition by others. While we find no prior Alabama case law directly on point, this Court will follow the lead of other jurisdictions that have considered this issue and have created an exception to the general rule: When the original publisher of a defamatory statement might reasonably expect the statement to be repeated, the original publisher is responsible for the damage that results from that repetition of the slander. Therefore, the answer to the certified question is yes.
QUESTION ANSWERED.
KENNEDY, J., concurs.
MADDOX, ALMON, HOUSTON, and SEE, JJ., concur specially.
SHORES and COOK, JJ., concur in the result in part and dissent in part.