# Supreme Court of Texas

No. 24-0368

Jane Roe,

*Appellant*,

v.

Leighton Paige Patterson and
Southwest Baptist Theological Seminary,

*Appellees*

On Certified Questions from the
United States Court of Appeals for the Fifth Circuit

**Argued September 11, 2024**

JUSTICE BLAND delivered the opinion of the Court.

In certified questions to our Court, the Fifth Circuit asks whether a defendant may be held liable for defamation absent direct evidence of the statements the defendant made to the publisher. In particular:

1. Can a person who supplies defamatory material to another for publication be liable for defamation?

2. If so, can a defamation plaintiff survive summary judgment by presenting evidence that a defendant was involved in preparing a defamatory publication, without identifying any specific statements made by the defendant?

The events underlying the claim before us arise in the higher education context. A board of directors removed a university president from his position, citing in part the president's mishandling of a student's report of sexual assault. Seeking to reinstate the president, a group of donors published an open letter to the board accusing the complaining student of lying to police about the assault and further stating that the encounters were consensual. The student sued the president and the university for defamation, claiming that the president's agent had provided the defamatory content published in the donor letter.

We answer yes to the two certified questions. First, a person who supplies defamatory material to another for publication may be liable if the person intends or knows that the defamatory material will be published. Second, a plaintiff may survive summary judgment without identifying the specific statements the defendant made in supplying the defamatory material if the evidence is legally sufficient to support a finding that the defendant was the source of the defamatory content.

# I

In 2015, at the beginning of her second year as a student at Southwestern Baptist Theological Seminary, Jane Roe reported to President Paige Patterson that a fellow student and university employee, John Doe, had sexually assaulted her at gunpoint on several occasions during the previous year.[1] Patterson notified Fort Worth

---

[1] Unusually, this certified question does not present a stipulated or settled factual record. In its posture before our Court, we do not resolve the appeal but instead answer the legal questions presented. Consistent with the

police, and Roe provided a statement to the responding officers detailing her account of the assaults. While an investigation into Roe's complaint was pending, university officials discovered a cache of firearms in Doe's room. Southwestern expelled Doe from the university for violating its campus firearms policy. He later died.

Several weeks after Roe made her report to Patterson, he emailed a staff member that he planned to meet with Roe again to "break her down." At the meeting, Patterson confronted Roe with Doe's version of events: that Roe and Doe's relationship was consensual and that Doe possessed proof in the form of nude photographs of Roe. Roe responded that she had not consented to a relationship nor to being photographed. Shortly after the meeting, Roe withdrew from Southwestern.

Nearly three years later, Southwestern's board of directors removed Patterson from his duties, citing in part his treatment of Roe. Seeking Patterson's reinstatement, a group of donors wrote to the board. The relevant parts of the letter stated that Roe had engaged in consensual sexual activity, that she had texted nude photographs to Doe, that she had made false statements to the police, and that her allegations of rape were false:

> It is our understanding that [the Board] knew full well that the female student's allegations of rape were false, that she

_____

standard of review, however, we "examine the evidence in the light most favorable to the non-moving party, indulging reasonable inferences and resolving doubts against the party seeking summary judgment." *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 73 (Tex. 2023); *cf. Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (summary judgment review generally requires viewing evidence in a light favorable to the non-movant).

3

had engaged in consensual sexual activities on more than one occasion and those acts had taken place in public buildings at the Seminary, and that campus security were shown the nude pictures she texted to the male student. It is our further understanding that [the Board] knew full well that she begged Dr. Patterson to not call the police, but he insisted that he would and he did so within six minutes of hearing her allegation.

Regarding the "break her down" email, the letter says:

The full Board understood and accepted Dr. Patterson's explanation of the phrase "breaking her down" that appeared in that email as being a statement of his desire to meet with her (without the police present, but clearly, as was always his practice, with other Seminary personnel present) and attempt to help her recant her false allegations of rape before she continued with such false statements to the police.

The donors sent copies of the letter to over one hundred others, including Southwestern faculty and alumni, church leaders, and members of the press. Scott Colter, Patterson's chief of staff, provided the donors with the list of recipients. Colter assisted the letter drafters in other ways, including by suggesting signatories for the letter, coordinating the timing and method of the letter's distribution, passing the draft to Patterson and his personal lawyer, and verifying and providing "additional info about the 2015 event."

Roe sued Southwestern and Patterson for defamation based on the text of the donor letter.[2] The federal district court granted summary

---

[2] Roe further alleges claims based on other publications that are not at issue here.

judgment, concluding that Colter had not acted as Patterson's agent when he participated in drafting the letter.

On appeal, the Fifth Circuit held that the summary judgment evidence created a fact issue as to whether Colter had acted as Patterson's agent. It then certified the questions to this Court, and we accepted them.

## II

The answer to the first question—whether a person who supplies defamatory material to another for publication can be liable for defamation—is yes. The parties agree with this answer. They part company, however, as to whether the person must intend or know that the defamatory material provided will be published or merely reasonably foresee that it could be published. Roe, relying on part of a Restatement comment and two intermediate appellate opinions, urges that a defamer may be liable for damages arising from foreseeable repetitions of that material.[3] Patterson, citing opinions from other courts of appeals and other state high courts, counters that a defamer

---

[3] *See* Restatement (Second) of Torts § 577 cmt. k (Am. L. Inst. 1977) ("If a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third person, the conduct becomes a negligent communication. A negligent communication amounts to a publication just as effectively as an intentional communication."); *Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 639–40 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding, for purposes of determining limitations period, that originator of defamation may be liable for subsequent foreseeable republications); *Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 889 (Tex. App.—Dallas 2000, no pet.) (same).

must, at the outset, intend or authorize the defamatory material's publication.[4]

"'Publication' occurs if the defamatory statements are communicated orally, in writing, or in print to some third person who is 'capable of understanding their defamatory import and in such a way that the third person did so understand.'"[5] The Restatement characterizes the intent to publish as "when the actor does an act *for the purpose of communicating it to a third person or with knowledge that it is substantially certain to be so communicated*."[6] The Restatement also allows for liability if "a reasonable person would recognize that an act

---

[4] *See Cyrus W. Scott Mfg. Co. v. Millis*, 67 S.W.2d 885, 887 (Tex. App.—Galveston 1933, writ dism'd) ("The law is well settled both in England and America, that the unauthorized and unprocured subsequent republication of the alleged libel by others who were in no way connected with the defendant, or originator of the alleged libel, cannot be offered in evidence either on the question of liability or enhancement of the damages."), *disapproved of on other grounds by Texam Oil Corp. v. Poynor*, 436 S.W.2d 129 (Tex. 1968); *Evans v. Am. Publ'g Co.*, 8 S.W.2d 809, 812 (Tex. App.—Dallas 1928) (speaker at convention not liable for damages resulting from newspaper's publication of his remarks the next day), *cert. question regarding venue answered*, 13 S.W.2d 358 (Tex. [Comm'n Op.] 1929). *See also Geraci v. Probst*, 938 N.E.2d 917, 922 (N.Y. 2010) (holding that it was error to admit evidence of republication, even for purposes of showing damages, because the defendant played no role in the republication); *Pulliam v. Bond*, 406 S.W.2d 635, 643 (Mo. 1966) (stating that defendants could not be liable for republication or dissemination because they did not publish the communication to anyone not authorized to receive it).

[5] *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017) (quoting *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.)).

[6] Restatement (Second) of Torts § 577 cmt. k (emphasis added).

creates an unreasonable risk that the defamatory matter will be communicated to a third person."[7]

The original defamer may be further liable for republication of a defamatory statement, but not without proof of an initial intentional or knowing publication. To recover for defamation, a plaintiff must identify the defamatory statements made and further demonstrate that the defendant was a source of those false statements.[8]

Fault is an important element of defamation liability, both in making the publication and with regard to its false and defamatory meaning.[9] A defamation plaintiff who is not a public figure must prove that the defendant knew or should have known that the statement was false and defamatory.[10] A plaintiff who is a public figure must further demonstrate that the statement was made with actual malice.[11] When

---

[7] *Id.*

[8] *See Polk Cnty. Publ'g Co. v. Coleman*, 685 S.W.3d 71, 76 (Tex. 2024) ("One such element [of a defamation claim] is 'the publication of a false statement of fact' by the defendant." (quoting *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018))).

[9] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

[10] *See Hancock v. Variyam*, 400 S.W.3d 59, 65 n.7 (Tex. 2013) (establishing negligence as the appropriate level of fault in a suit between private parties); *Neely v. Wilson*, 418 S.W.3d 52, 72 (Tex. 2013) (describing the negligence standard). An exception exists for media defendants if the content of the false statement "would not 'warn a reasonably prudent editor or broadcaster of its defamatory potential.'" *D Mag. Partners v. Rosenthal*, 529 S.W.3d 429, 440 (Tex. 2017) (quoting *Neely*, 418 S.W.3d at 72). Identifying the meaning of a publication, and thus whether it is false and defamatory, is a question of law for the court. *Polk Cnty. Publ'g*, 685 S.W.3d at 76–77.

[11] *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (describing actual malice standard as requiring that "the statement was made with knowledge of its falsity or with reckless disregard for its truth").

relying on identified content to contend that a defendant was the source of the defamation, a plaintiff must show the requisite level of intent for an initial publication.

The certified questions and the parties focus on liability for republication. But Roe attempts to hold Patterson—through his putative agent Colter—directly liable for the publication of the allegedly defamatory material in the donor letter. Thus, the publication of the donor letter is the initial publication, and Roe must show that Colter intended or knew that the defamatory statements in the donor letter would be published.[12]

In answering the first certified question, we do not address the circumstances in which an original defamer may be held liable for republication of defamatory material once a plaintiff establishes liability for an identified publication. In limited circumstances, the Restatement would impose liability for reasonably foreseeable republications.[13] A century ago, some appellate cases suggested such an expansive view of

---

[12] Roe does not allege that Colter recklessly failed to heed the risk of publication, but rather that he actively participated in drafting the letter and transmitting it to a wide audience. Given the nature of the allegations of this case, we need not decide whether liability can arise in circumstances that do not demonstrate intentional or knowing publication. *See* Restatement (Second) of Torts § 577 cmt. k.

[13] "The publication of a libel or slander is a legal cause of any special harm resulting from its repetition by a third person if, but only if, (a) the third person was privileged to repeat it, or (b) the repetition was authorized or intended by the original defamer, or (c) the repetition was reasonably to be expected." *Id.* § 576.

foreseeability.[14] In the modern era, however, other state high courts have rejected or narrowed the circumstances in which repetition may be foreseeable. In *Geraci v. Probst*, for example, the defendant defamed his former business partner to a local government entity.[15] Three years later, after the plaintiff had sued for defamation, a newspaper published an article regarding the government's investigation. The Court of Appeals for New York held that the article was not a basis for liability for additional damages because the defendant never spoke to the reporters or otherwise widely disseminated the defamation.[16]

With facts that contrast to those in *Geraci*, two state high courts have permitted repetition damages when the original speaker furnished the defamatory material to the news media with the expectation of the material's publication.[17]

---

[14] *E.g.*, *Sw. Tel. & Tel. Co. v. Long*, 183 S.W. 421, 428 (Tex. App.—Austin 1915, no writ) ("He who utters a slander, especially against the reputation of a woman for chastity, must know that he is opening a veritable Pandora's box. He must realize that he is turning loose, as it were, the down of thistle, and ought not to be heard to say that he is not responsible for the wind's scattering it abroad.").

[15] 938 N.E.2d 917 (N.Y. 2010).

[16] *Id.* at 921; *see also Pulliam*, 406 S.W.2d at 643 ("The defendants would not be liable, however, for any republication or dissemination of the communication by the plaintiff, or which resulted from the independent or unauthorized acts of others into whose hands the statement came . . . .").

[17] *Barnette v. Wilson*, 706 So. 2d 1164, 1166–67 (Ala. 1997) (answering certified question that a person who publishes a slander at a press conference is responsible for damages caused by the expected and intended repetition of the slander by the media); *Mitchell v. Superior Ct.*, 690 P.2d 625, 633 (Cal. 1984) ("In our opinion, if a source acting with actual malice furnishes defamatory material to a publisher with the expectation that the material

Roe did not plead special damages arising from a particular republication of the donor letter, and her defamation claim rests on the statements in the letter as the initial defamatory publication. We therefore do not address the precise mental state required to find liability based on further repetition of the defamatory material.[18]

## III

Having answered the first question in the affirmative, we turn to the Fifth Circuit's second question, which asks whether a defamation plaintiff must identify a specific statement by the defendant to survive summary judgment when the plaintiff's claim is that the defendant provided defamatory material for publication.[19]

---

(either verbatim or in substance) will be published, the source should be liable for the publication.").

[18] When the subject matter is defamatory per se, the general rule is that the plaintiff may recover general damages from the initial defamation and special damages from republication. *See Hancock*, 400 S.W.3d at 65–66 (noting that juries may presume general damages in defamation per se cases when the speech is not a matter of public concern); Restatement (Second) of Torts § 576 cmt. a (permitting claims for special harm resulting from reasonably expected repetitions). The donor letter accuses Roe of having made a false report to the police—that is, having committed a crime; if false, such a statement may qualify as defamatory per se. *See Lipsky*, 460 S.W.3d at 596 ("Accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se."); Tex. Penal Code § 37.08 (making it an offense to knowingly make a false statement to law enforcement that is material to a criminal investigation).

[19] Citing *Belo v. Fuller*, 19 S.W. 616, 617 (Tex. [Comm'n Op.] 1892), Roe argues that a defendant may be liable for any defamatory publication that he participates in making. *Belo* suggests that a defendant who aids, assists, or advises the publication of defamatory material may be liable. *Id.* Mere presence for the publication of a defamation, however, will not cause liability to attach. *See Bentley v. Bunton*, 94 S.W.3d 561, 586 (Tex. 2002).

Roe contends that a defamation plaintiff need not prove a precise phrase or statement made in contributing to a defamatory publication if the evidence demonstrates that the defendant was the source of the identified defamatory statements. Patterson responds that Roe must identify the specific slanderous statements that a defendant made in providing defamatory material for publication.

In some cases, the parties do not dispute the source of allegedly defamatory statements. In others, the question can remain—as it does in this case—whether a particular defendant is responsible for the publication of identified statements alleged to be defamatory. Because a defendant may direct the publication of defamatory information orally or through forms of undiscoverable communication, we conclude that a plaintiff, having identified a defamatory statement, must show that the defendant was the source of the statement. A plaintiff need not adduce evidence of the specifics of an underlying communication, however, so long as the evidence shows that the defendant was the source of the identified communication.

The plaintiff may meet this burden through direct or circumstantial evidence. A "fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts" adduced as evidence.[20] Evidence that the defendant was the source of defamatory content may include proof that the defendant made the same defamatory statement to others, that the defendant had unique or personal knowledge of the defamatory content and its details,

---

[20] *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995).

11

or that the publishers relied on the defendant to support the truthfulness of the allegedly defamatory statements. Evidence that amounts to mere speculation or surmise does not suffice to survive summary judgment, for this or any other tort.[21]

*　　*　　*

To prove a claim for defamation for an identified publication, a plaintiff must show that the defendant supplied the defamatory content through direct or circumstantial evidence. That evidence need not establish verbatim the underlying provision of defamatory content so long as the evidence demonstrates that the defendant was a source of the identified statements alleged to be defamatory. We answer yes to the Fifth Circuit's certified questions and leave the application of the law to the facts of this case to that court.

Jane N. Bland<br>
Justice

**OPINION DELIVERED:** February 14, 2025

---

[21] *E.g.*, *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) ("To raise a genuine issue of material fact, however, the evidence must transcend mere suspicion.").